**Nos. 24-5849, 24-5894**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

EIGHT MILE STYLE, LLC; MARTIN AFFILIATED, LLC,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

SPOTIFY USA INC.,

*Defendant-Appellee/Cross-Appellant.*

KOBALT MUSIC PUBLISHING AMERICA, INC.;
HARRY FOX AGENCY, LLC,

*Defendants-Appellees* [24-5849]
*Defendants* [24-5894]

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:19-cv-00736, The Honorable Aleta A. Trauger

**Principal And Response Brief Of Defendant-**
**Appellee/Cross-Appellant Spotify USA Inc.**

Matthew Ingber
*mingber@mayerbrown.com*
Allison Aviki
*aaviki@mayerbrown.com*
Rory Schneider
*rschneider@mayerbrown.com*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2500

Andrew J. Pincus
*apincus@mayerbrown.com*
Archis A. Parasharami
*aparasharami@mayerbrown.com*
Daniel E. Jones
*djones@mayerbrown.com*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
Telephone: (202) 263-3000

*Attorneys for Defendant-Appellee /*
*Cross-Appellant Spotify USA Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Sixth Circuit Rule 26.1, Defendant-Appellee / Cross-Appellant Spotify USA Inc. hereby certifies as follows.

1.     Spotify USA Inc. is a wholly-owned subsidiary of Spotify AB. Spotify AB is a wholly-owned subsidiary of Spotify Technology S.A., a publicly traded company that does not have a parent corporation. No publicly traded corporation owns 10% or more of the common stock of Spotify Technology S.A.

2.     The following insurance companies are publicly owned corporations or subsidiaries of publicly owned corporations and have a potential financial interest in the outcome of the litigation: Chubb, Great Lakes SE, and Allianz Global Corporate & Specialty SE.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES ................................................................... v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................xi

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 4

ISSUES PRESENTED .......................................................................... 5

STATEMENT OF THE CASE ............................................................... 6

    A.    The Pre-2021 Mechanical Licensing System Was Wholly Incompatible With Music Streaming. ....................... 6

    B.    Spotify Obtains Mechanical Licenses And Pays Royalties, Including Through The Harry Fox Agency. ......... 9

    C.    Eight Mile's Actions Consistently Pointed To Kobalt As The Party Responsible For Licensing............................. 13

    D.    Kobalt Enters Into Agreements With Spotify. ..................... 18

    E.    Procedural History And Decision Below. .......................... 20

SUMMARY OF ARGUMENT ............................................................. 23

STANDARD OF REVIEW.................................................................. 27

ARGUMENT ...................................................................................... 27

I.    The District Court Correctly Held That Eight Mile's Claims Are Barred By Estoppel. ............................................................. 27

    A.    The district court applied the correct framework for equitable estoppel. ............................................................. 28

    B.    The district court correctly concluded that undisputed facts establish each element of estoppel............................ 32

        1.    Eight Mile knew of Spotify's allegedly infringing conduct for years. ...................................................... 32

# TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| | 2. | Eight Mile's conduct directed would-be licensees (like Spotify) to go to Kobalt. | 38 |
| | 3. | Spotify did not know of the facts that Eight Mile deliberately obscured. | 47 |
| | 4. | Spotify was injured as a result of Eight Mile's culpable conduct. | 50 |
| | 5. | Eight Mile fails to identify a triable issue of material fact. | 53 |
| C. | | Eight Mile's other attempts to avoid estoppel fail. | 54 |
| | 1. | Eight Mile's waiver argument is baseless. | 54 |
| | 2. | The district court properly addressed equitable estoppel at the liability stage. | 56 |
| | 3. | Spotify was not barred by unclean hands from asserting estoppel. | 57 |

CROSS-APPEAL ARGUMENT ........................... 61

I.    Spotify Had An Implied License To Use The EMS Compositions. ........................... 62

     A.    Eight Mile's knowledge of and acquiescence in Spotify's use of the EMS Compositions created an implied license. ........................... 62

     B.    The district court erred as a matter of law in requiring Eight Mile to have subjective intent to license the works. ........................... 66

II.    Because Kobalt Acted With Apparent Authority From Eight Mile, The 2016 BMLA And The Release In The NMPA Settlement Authorized Spotify's Use Of The EMS Compositions. ........................... 68

III.    The Music Modernization Act's Blanket License Independently Authorized Use Of The EMS Compositions Since January 1, 2021. ........................... 74

# TABLE OF CONTENTS
(continued)

**Page**

    A.    The statutory text and structure accomplish Congress's goal of providing comprehensive coverage not tied to the pre-MMA system. ...........................................75

    B.    Eight Mile's reading of the MMA is wrong...........................76

    C.    Eight Mile's reading yields absurd results.........................79

CONCLUSION ....................................................................81

CERTIFICATE OF COMPLIANCE.......................................83

CERTIFICATE OF SERVICE................................................84

DESIGNATION OF RELEVANT ORIGINATING COURT DOCUMENTS ...............................................................85

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
    960 F.2d 1020 (Fed. Cir. 1992) ............................................................ 58

*ABKCO Music, Inc. v. Sagan*,
    50 F.4th 309 (2d Cir. 2022) ...................................... 29, 32, 38, 65, 66

*Abraham v. Alpha Chi Omega*,
    708 F.3d 614 (5th Cir. 2013) ............................................................ 58

*Baisden v. I'm Ready Prods., Inc.*,
    693 F.3d 491 (5th Cir. 2012) ...................................................... 63, 67

*Bledsoe v. Tennessee Valley Auth.*,
    42 F.4th 568 (6th Cir. 2022) ............................................................ 55

*Broadcast Music, Inc. v. Roger Miller Music, Inc.*,
    396 F.3d 762 (6th Cir. 2005) ...................................................... 27, 39

*Cacevic v. City of Hazel Park*,
    226 F.3d 483 (6th Cir. 2000) ............................................................ 56

*Carson v. Dynegy, Inc.*,
    344 F.3d 446 (5th Cir. 2003) ............................................ 23, 29, 38, 43

*CBS, Inc. v. Stokely-Van Camp, Inc.*,
    522 F.2d 369 (2d Cir. 1975) ............................................................ 71

*Central Ill. Pub. Serv. Co. v. Atlas Mins., Inc.*,
    146 F.3d 448 (7th Cir. 1998) ............................................................ 55

*Cleveland Newspaper Guild, Local 1 v. Plain Dealer
    Publ'g Co.*,
    839 F.2d 1147 (6th Cir. 1988) ................................................ 57, 58, 60

*Cleveland v. Policy Mgmt. Sys. Corp.*,
    526 U.S. 795 (1999) ........................................................................ 34

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*De Forest Radio Tel. & Tel. Co. v. United States*,
273 U.S. 236 (1927)..................................................................63

*Deere & Co. v. FIMCO Inc.*,
239 F. Supp. 3d 964 (W.D. Ky. 2017) ..................................67

*Elvis Presley Enters. v. Elvisly Yours, Inc.*,
936 F.2d 889 (6th Cir. 1991)..................................................58

*Evox Prods., LLC v. Chrome Data Sols., LP*,
2023 WL 1879479 (9th Cir. Feb. 10, 2023)........................64

*ExperExchange, Inc. v. Doculex, Inc.*,
2009 WL 3837275 (N.D. Cal. Nov. 16, 2009)....................64

*Field v. Google*,
412 F. Supp. 2d 1106 (D. Nev. 2006)............................51, 64

*Fogerty v. MGM Holdings Corp.*,
379 F.3d 348 (6th Cir. 2004).......................................33, 36

*Global Force Entm't, Inc. v. Anthem Wrestling Exhibitions, LLC*,
2020 WL 6440503 (M.D. Tenn. May 27, 2020)..................67

*Green Door Realty Corp. v. TIG Ins. Co.*,
329 F.3d 282 (2d Cir. 2003) ..................................................70

*Hampton v. Paramount Pictures Corp.*,
279 F.2d 100 (9th Cir. 1960)..................................................29

*Herbert Constr. Co. v. Cont'l Ins. Co.*,
931 F.2d 989 (2d Cir. 1991) ..................................................73

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
191 F.3d 813 (7th Cir. 1999)..................................................58

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*I.A.E., Inc. v. Shaver*,
  674 F.3d 768 (7th Cir. 1996).............................................................. 67

*J.C. Wyckoff & Assocs. v. Standard Fire Ins.*,
  936 F.2d 1474 (6th Cir. 1991)............................................................ 53

*Johnson v. Jones*,
  149 F.3d 494 (6th Cir. 1998)................................................. 62, 63, 67

*Jolivette v. Husted*,
  694 F.3d 760 (6th Cir. 2012)........................................................ 56, 57

*Kars 4 Kids Inc. v. America Can!*,
  98 F.4th 436 (3d Cir. 2024)................................................................ 58

*Keane Dealer Servs., Inc. v. Harts*,
  968 F. Supp. 944 (S.D.N.Y. 1997)...................................................... 64

*L.F.P.IP., Inc. v. Hustler Cincinnati, Inc.*,
  2011 WL 5024356 (S.D. Ohio Oct. 20, 2011) .................................... 67

*Michigan Express, Inc. v. United States*,
  374 F.3d 424 (6th Cir. 2004)............................................................. 30

*Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entm't
  Servs.*,
  1996 WL 263008 (S.D.N.Y. May 17, 1996)....................................... 70

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017)........................................................................... 78

*Noble v. Chrysler Motors Corp.*,
  32 F.3d 997 (6th Cir. 1994)............................................................... 54

*Parker v. Yahoo!, Inc.*,
  2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) ................................... 64

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Parlato v. Equitable Life Assur. Soc.*,
299 A.D.2d 108 (N.Y. App. Div. 2002) ................................................. 73

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014) ...................................................................... 31, 57

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
894 F.3d 1015 (9th Cir. 2018) ....................................................... 57, 58

*Roger Miller Music, Inc. v. Sony/ATV Publishing Inc.*,
2005 WL 5351103 (M.D. Tenn. July 11, 2005) .................................. 64

*Russello v. United States*,
464 U.S. 16 (1983) ................................................................................ 79

*Sanborn Library LLC v. ERIS Info., Inc.*,
2024 WL 1744630 (S.D.N.Y. Mar. 25, 2024) ..................................... 32

*Schnadig Corp. v. Gaines Mfg. Co.*,
494 F.2d 383 (6th Cir. 1974) ............................................................... 57

*Scott v. Harris*,
550 U.S. 372 (2007) .............................................................................. 33

*Street v. J.C. Bradford & Co.*,
886 F.2d 1472 (6th Cir. 1989) ............................................................. 33

*Thomas v. United States*,
166 F.3d 825 (6th Cir. 1999) ............................................................... 27

*Towers World Airways Inc. v. PHH Aviation Sys. Inc.*,
933 F.2d 174 (2d Cir. 1991) ................................................................ 71

*TWM Mfg. Co. v. Dura*,
592 F.2d 346 (6th Cir. 1979) ................................................... 29, 57, 58

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*,
446 F. Supp. 2d 1164 (E.D. Cal. 2006) ................................................ 65

*Viper Nürburgring Record LLC v. Robbins Motor Co., LLC*,
2019 WL 4256372 (D. Kan. Sept. 9, 2019) ................................... 32, 51

*White v. Baptist Mem'l Health Care Corp.*,
699 F.3d 869 (6th Cir. 2012) ........................................................ 34, 36

*Yellow Book USA, LP v. Dearworth*,
2002 WL 31999361 (Del. Com. Pl. Oct. 1, 2002) ............................... 72

**Statutes and Rules**

17 U.S.C.
§ 102(a)(2) ............................................................................... 6
§ 102(a)(7) ............................................................................... 6
§ 115(a)(1)(A)(i) ..................................................................... 76
§ 115(a)(1)(A)(ii) .................................................................... 76
§ 115(b)(1) (2010) ..................................................................... 8
§ 115(b)(2)(A) ................................................................... 77, 80
§ 115(b)(2)(B) ........................................................................ 78
§ 115(b)(4)(B)(i)(I) ................................................................. 77
§ 115(d)(1) ............................................................................... 9
§ 115(d)(1)(A) ........................................................................ 75
§ 115(d)(1)(B)(i) ..................................................................... 76
§ 115(d)(1)(D) ........................................................................ 75
§ 115(d)(2) ........................................................................ 9, 78
§ 115(d)(2)(A) ........................................................................ 74
§ 115(d)(3) ............................................................................... 9
§ 115(d)(9)(A) ........................................................................ 79
§ 115(d)(10)(A) ................................................................... 9, 80
§ 115(d)(10)(B) ........................................................................ 9

28 U.S.C. § 1291 ............................................................................ 4

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

28 U.S.C. § 1331 ................................................................. 4

28 U.S.C. § 1338(a) .......................................................... 4

Fed. R. Civ. P. 54(b) ........................................................ 4

Fed. R. Civ. P. 56(d) ....................................................... 56

## Other Authorities

Merriam-Webster, "Blanket," https://www.merriam-
    webster.com/dictionary/blanket ............................. 75

1 Raymond T. Nimmer & Jeff C. Dodd, Modern Licensing
    Law § 10:4 (2010-2011 ed.) .................................... 67

3 Nimmer on Copyright § 10.03[A] (1994) ...................... 63

4 Nimmer on Copyright § 13.07 (2002) ........................... 29

Restatement (Second) of Agency § 125 (1958) .............. 73

Restatement (Second) of Torts § 894(2) (1979) ............. 29

Restatement (Second) of Torts § 894(2) cmt. e (1979) .... 29

S. Rep. No. 115-339 ....................................................... 8

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Spotify respectfully requests oral argument. Eight Mile's appeal and Spotify's cross-appeal raise several important legal issues, and Spotify believes that oral argument will assist the Court in analyzing those issues and enable the parties to address any questions the Court may have about the significant legal issues in this case.

## INTRODUCTION

When Eight Mile Style filed this copyright infringement lawsuit in 2019, it had known for eight years that Spotify was streaming the musical works at issue and paying Eight Mile for the use of those works. During that time, Eight Mile never said a word to Spotify about the use of its music—no objection, no cease-and-desist letter, not even a question.

That was no accident. As the district court held, Eight Mile "was not a hapless victim," but instead chose to "affirmatively foster[] and fail[] to rectify the confusion surrounding its rights" as part of its "business strategy" of "improperly cho[osing] the cultivation of infringement damages over the proper functioning of the copyright system." Order, RE.704, PageID#64237, 64283. After a careful analysis of the undisputed record evidence, the district court rejected Eight Mile's claims on grounds of equitable estoppel—a well-established doctrine authorizing the denial of copyright infringement claims based on the misleading and inequitable acts and omissions of the copyright holder.

On appeal, Eight Mile tries to change the subject from the misconduct that led to the district court's estoppel ruling by attacking Spotify, asserting that Spotify streamed the works (the "EMS

Compositions") without regard to whether it had a license. Those assertions are incorrect; they also do nothing to undermine the district court's estoppel holding. The undisputed facts demonstrate that it was *Eight Mile* that engaged in "culpable conduct" to stymie Spotify's efforts to obtain broad licensing coverage encompassing the EMS Compositions. Order, RE.704, PageID#64275-77.

Most significantly, Spotify entered into agreements encompassing the EMS Compositions with Kobalt Music Group, a prominent publishing rights administrator that had long worked with Eight Mile. That was what Eight Mile wanted. It is undisputed that Eight Mile told the music industry that Kobalt was the place to go to obtain licenses to, and pay royalties for, the EMS Compositions. Eight Mile had previously directed Kobalt to register itself with databases relied on by Spotify and other streaming services for licensing, and Eight Mile was aware that those databases listed Kobalt as the appropriate contact for licensing requests. Indeed, several years before this lawsuit was filed, Eight Mile developed a "plan of attack" to update those databases to replace Kobalt as the designated contact, but it abandoned that plan. As the district court

explained, Eight Mile "ultimately did not take any steps to correct the registrations." *Id.* at PageID#64251.

As a result, Eight Mile intentionally continued to hold Kobalt out to the industry as the point of contact for licensing and royalty payments—choosing not to keep the industry "apprised of the actual allocation of licensing rights." *Id.* at PageID#64284. All the while, Eight Mile knowingly collected payments from Spotify. But then Eight Mile abruptly changed its tune and filed this lawsuit.

In light of these undisputed facts, and others discussed below, the district court correctly concluded that all of the elements of equitable estoppel were satisfied here. Eight Mile challenges the legal standard for estoppel applied by the district court, but that test is broadly accepted—it has been endorsed by several courts of appeals and a leading copyright treatise.

Finally, while this Court should affirm the district court's judgment in Spotify's favor on estoppel grounds, Spotify's conditional cross-appeal provides alternative bases for upholding the judgment. As explained below, many of the facts and circumstances that support estoppel also demonstrate that Spotify had an implied license to use the EMS

Compositions: Eight Mile's knowing acceptance of royalties and failure to object to Spotify's use of the Compositions is conduct that—viewed objectively—created an implied license as a matter of law. In addition, because Kobalt acted with apparent authority from Eight Mile, the 2016 direct license agreement between Kobalt and Spotify and releases under an industry settlement permitted use of the works. The district court's contrary conclusions rest entirely on errors of law.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered a separate final judgment on Eight Mile's claims under Federal Rule of Civil Procedure 54(b) on September 6, 2024. RE.722, PageID#65054. Eight Mile appealed on September 17, 2024. RE.732, PageID#65839-43. Spotify timely filed a conditional cross appeal on October 1, 2024. RE.736, PageID#66016.

## ISSUES PRESENTED

The issue presented in Eight Mile's appeal is:

Whether the district court correctly granted summary judgment on the ground that Eight Mile, a sophisticated copyright litigant, was precluded from pursuing its claims here by the doctrine of equitable estoppel because Eight Mile knew that its musical works were being used on Spotify's service for years, knowingly accepted royalty payments, and engaged in "culpable conduct" to mislead Spotify regarding the entity authorized to license the works.

The issues presented in Spotify's cross-appeal are:

1.     Whether Spotify had an implied license because Eight Mile's conduct—in particular its awareness that its works were available on Spotify and acceptance of payments for that use—made it objectively reasonable to infer that Eight Mile had consented to use of the works.

2.     Whether Kobalt acted with apparent authority from Eight Mile to license use of and release claims regarding Eight Mile's works.

3.     Whether Spotify's use of Eight Mile's musical works since January 1, 2021 was independently authorized by the blanket compulsory license under the Music Modernization Act.

## STATEMENT OF THE CASE

### A.    The Pre-2021 Mechanical Licensing System Was Wholly Incompatible With Music Streaming.

This case concerns "mechanical" rights under U.S. copyright law. A music recording implicates at least two distinct kinds of independently copyrightable works: (1) the composition or *musical work*—the words and music composed by a songwriter; and (2) the *sound recording*, which involves the particular sounds that are fixed or embodied in a recording. *See* 17 U.S.C. § 102(a)(2) ("musical works"); *id.* § 102(a)(7) ("sound recordings"). A license to reproduce and distribute the words and music of the musical work is known as a "*mechanical license.*" Order, RE.704, PageID#64238 (emphasis added).

Mechanical licenses have been subject to a statutory compulsory licensing system since the days of player pianos. *Id.* at PageID#64239. But because record labels—which had mechanical rights to reproduce or distribute songs on vinyl records or CDs—were unwilling to "pass through" those rights to streaming services, those services had to obtain and pay for mechanical licenses on a song-by-song basis for each of the millions of songs made available to their subscribers.

Prior to Congress's enactment of the Music Modernization Act ("MMA"), streaming services faced considerable difficulties in obtaining compulsory licenses. They had to both (1) identify the underlying composition embodied in a particular sound recording; and (2) identify the individuals or entities with the rights to the underlying composition and pay each of them their share of royalties. *See* Levine Report, RE.590-10, PageID#45335-36; U.S. Br., RE.550, PageID#42101-02.

These tasks were complicated. As the Register of Copyrights (who heads the Copyright Office) explained in 2015, while digital recordings may have standard *sound recording* identifiers, "there is no comprehensive, publicly accessible database that can be used to match" the standard identifying codes of a *sound recording* to a *musical work* (and vice versa). Copyright and the Music Marketplace, RE.627-16, PageID#51252. The Register also noted the "lack of publicly accessible, authoritative identification and ownership data" for compositions—a problem compounded by frequent "changes when musical works and catalogs change hands." *Id.*

Streaming services could obtain a compulsory mechanical license under the pre-MMA statute by issuing a Notice of Intention, or "NOI,"

prior to using a work. *See* 17 U.S.C. § 115(b)(1) (2010). The statute allowed services to send an NOI to the Copyright Office when the rightsholders could not be identified (*id.*), but streaming services still needed to match each recording to the underlying composition or compositions that it embodied. For these reasons, as the government explained in the district court, the "pre-MMA compulsory licensing scheme proved an ill fit for the world of online streaming," because that regime "did not 'functionally work to meet the needs of the digital music economy[.]'" U.S. Br., RE.550, PageID#42100-01 (quoting S. Rep. No. 115-339, at 4).

These challenges—faced by every streaming service—led to settlements with mechanical rights owners and litigation across the industry. For example, the National Music Publishers' Association ("NMPA") entered into multiple settlements, including with Google, Soundcloud, and Spotify. SUMF ¶¶ 277-78, 311, RE.590-5, PageID#45221-22, 45231 (unredacted at RE.325). And many services faced lawsuits alleging failure to comply with the pre-MMA regime. Harrison Hearing Testimony, RE.647-2, PageID#54767-69 (citing lawsuits against Spotify, Apple, and Rhapsody).

These issues led Congress to enact the MMA in October 2018 because of its "belief that 'continued litigation' over infringement under the pre-MMA scheme 'generates unnecessary administrative costs,' which 'divert[] royalties from artists.'" U.S. Br., RE.550, PageID#42102. Central to the MMA are amendments to Section 115 of the Copyright Act that replace the song-by-song mechanical licensing system with a single, "*blanket*" compulsory mechanical license for streaming services ("digital music providers") beginning on January 1, 2021. 17 U.S.C. § 115(d)(1)-(2). Congress provided that the blanket license would be administered by the Mechanical Licensing Collective (MLC). *Id.* § 115(d)(3). The blanket license is available to any digital music provider that follows the statutory requirements. *Id.* § 115(d)(2).[1]

### B. Spotify Obtains Mechanical Licenses And Pays Royalties, Including Through The Harry Fox Agency.

In the 1990s and early 2000s, the proliferation of broadband Internet and technology for compressing music files produced file-sharing

---

[1] The MMA also contains a limitation on liability for digital music providers' usage of musical works during the transition period before the blanket license became available. *See* 17 U.S.C. § 115(d)(10)(A)-(B). The district court did not need to reach whether Spotify is eligible for the MMA's limitation on liability.

services like Napster and led to unprecedented levels of piracy, threatening to wipe out the music industry. SUMF ¶ 8, RE.590-5, PageID#45143.

Spotify, founded in Sweden in 2006, sought to offer a legal alternative to music piracy sites and ensure that, unlike Napster and similar platforms, artists and other rightsholders received appropriate compensation for the use of their music. In just a few years, streaming services like Spotify and its competitors (such as Apple Music and Google Play Music) turned around the music industry's fortunes. Levine Report, RE.590-10, PageID#45332.

Given Spotify's focus on providing an alternative to piracy, it has long expended tremendous effort and resources to ensure that the music on its service is properly licensed and that rightsholders are appropriately compensated. SUMF ¶¶ 371-73, 379-84, 402-58, RE.590-5, PageID#45249-50, 45251-52, 45258-75. Kobalt founder Willard Ahdritz said in 2015 that "credit goes to Spotify" for "single handedly" reducing the share of illegal music use in Scandinavia (where Spotify was founded) from 80% in 2009 to just 4%. Ahdritz Interview, RE.612-9, PageID#49013. Spotify's efforts also earned Spotify credit for "music's

financial turnaround" in the U.S. NYTimes Article, RE.633-12, PageID#52666.

Spotify retained the Harry Fox Agency (HFA) in the U.S. to assist with identifying the rightsholders in musical works, obtaining mechanical licenses for such works, and paying and reporting royalties. SUMF ¶¶ 19-20, 371-72, 379, 384, 443, RE.590-5, PageID#45146, 45249, 45251-52, 45271. As the Copyright Office has recognized, third-party mechanical rights organizations routinely assisted with licensing—and "[t]he oldest and largest such organization is the Harry Fox Agency." Copyright and the Music Marketplace, RE.657-14, PageID#58075. HFA's clients have included not just Spotify, but also Apple, YouTube, Google Play Music, and Rhapsody. SUMF ¶ 20, RE.590-5, PageID#45146. Indeed, when the MLC (established under the MMA) looked for a vendor to perform matching and payment services, it unanimously chose HFA. *Id.* ¶¶ 468-74, PageID#45277-79.[2]

---

[2]    Eight Mile says that, at the time that Spotify retained HFA, HFA's database was limited to information obtained from publishers affiliated with HFA. EMS Br. 8. That's false; thousands of unaffiliated rightsholders submitted information to HFA. Bradley Dep., RE.619-12, PageID#49787-88.

HFA maintained the most comprehensive database of any mechanical rights organization. SUMF ¶¶ 14-15, 21, RE.590-5, PageID#45145, 45147. Using its database, HFA deployed an electronic matching process to identify publishing rightsholders. HFA also was authorized to issue licenses on behalf of many publishers. Spotify secured mechanical rights through these HFA licenses as well as direct license agreements and compulsory licenses under the pre-MMA version of Section 115 of the Copyright Act. *Id.* ¶¶ 384-87, PageID#45252-53; Kanner Dep., RE.660-6, PageID#58698.

Spotify always paid royalties to identified rightsholders and accrued royalty amounts owed to unidentified rightsholders. The accrued royalties were paid once a work was matched and, because they were held as a reserve, didn't benefit Spotify's bottom line. SUMF ¶ 383, RE.590-5, PageID#45252. Indeed, Spotify always paid the vast majority of its revenues to rightsholders; today, its royalty payouts account for approximately two-thirds of its revenue. *Id.* ¶ 12, PageID#45144. Spotify has paid a total of over $60 billion to rightsholders, including music publishers and songwriters.[3]

---

[3]   *See* https://loudandclear.byspotify.com/#takeaway-1.

### C.   Eight Mile's Actions Consistently Pointed To Kobalt As The Party Responsible For Licensing.

Plaintiffs Eight Mile Style and Martin Affiliated are closely-held companies that assert interests in 242 musical compositions written or co-written by Marshall Mathers, better known as Eminem. SUMF ¶ 33, RE.590-5, PageID#45150. Both plaintiffs are controlled by Joel Martin and managed day-to-day by his associate Sarah Catlett. *Id.* ¶¶ 29, 31, 44, 51, PageID#45149, 45152, 45154.

Eight Mile's business is to profit from the EMS Compositions. Martin is a sophisticated and experienced industry participant. An Eight Mile prospectus from 2012 emphasized Martin's "experience in profitably managing music-related assets" and his "reputation for his protection of his music assets, thereby safeguarding their value as well as general revenue from them." Prospectus, RE.619-10, PageID#49773-74.

Litigation is central to Eight Mile's business model. Eight Mile describes itself as "consistently vigilant and aggressive in pursuing various claims," and it predicted to investors that "enforcement in the future is expected to be an important source of … significant revenue." *Id.* at PageID#49773.

In practice, licensing of mechanical rights is often handled through third-party administrators. Copyright and the Music Marketplace, RE.627-16, PageID#51252. Eight Mile has long worked with Kobalt, a publishing rights administrator with thousands of clients and over half a million musical works in its catalog at any given time. SUMF ¶¶ 75, 79-80, RE.590-5, PageID#45160-62. Eight Mile was among the first major U.S.-based clients to hire Kobalt. *Id.* ¶ 81, PageID#45162.

By 2009, Kobalt was providing all services related to the EMS Compositions globally, including in the United States. *Id.* ¶¶ 88-92, PageID#45164-65. In 2009, Kobalt assumed additional domestic responsibilities—including the exclusive rights to register the copyright in the Compositions in the name of Kobalt as the administrator and to issue most types of licenses for the Compositions. 2009 Eight Mile-Kobalt Agreement, RE.627-6, PageID#51213-14; 2007 Eight Mile-Kobalt Agreement, under seal at RE.356-16. At Eight Mile's direction, Kobalt "registered" itself in HFA's database and the databases of other mechanical and performing rights organizations as being responsible for most of the EMS Compositions. SUMF ¶¶ 183-212, RE.590-5, PageID#45194-201.

14

In 2011, Eight Mile restructured its contracts to, at least on paper, reallocate some responsibilities for the EMS Compositions in the United States. *Id.* ¶ 100, PageID#45167. It purported to engage Bridgeport Music Inc.—a company managed by Eight Mile's Martin and owned by Martin's longtime friend and mentor, Armen Boladian—to work alongside Kobalt. *Id.* ¶ 39, PageID#45151. As Eight Mile's counsel told the district court: "Bridgeport and Eight Mile Style for purposes of this are Joel Martin. Joel Martin … controls Bridgeport and Eight Mile Style. So it's really Joel Martin who's Bridgeport. It's not like two different companies. They are two different companies, but Joel Martin's in charge of both." Hearing Tr., RE.735, PageID#65973.

According to the contracts, Bridgeport was supposed to license the EMS Compositions and register the Compositions in its name with industry organizations like HFA. Bridgeport-Martin Affiliated Agreement, under seal at RE.332-20, p.18. The agreement between Bridgeport and Eight Mile also included a draft formal letter of direction ("LOD") that could be used to inform third parties of the anticipated changes in licensing rights. *Id.* at pp.27-28.

In reality, however, Bridgeport did virtually nothing with the EMS Compositions. It issued no licenses to the EMS Compositions; it did not register even a single composition with HFA or any other organization; and neither Eight Mile nor Bridgeport ever sent an LOD or otherwise notified anyone about Bridgeport's purported assumption of responsibility for the Compositions. SUMF ¶¶ 107-27, RE.590-5, PageID#45169-76. Martin also directed Bridgeport not to register the EMS Compositions with HFA and other organizations. Martin Dep., RE.619-8, PageID#49703. All of this was by design: Bridgeport received fees for doing nothing because Martin owed Boladian money for financing litigation and the agreements were a way to repay Boladian. Boladian Decl., RE.627-8, PageID#51224-25.

Notwithstanding this contractual allocation of responsibilities, Kobalt "was, by a considerable margin," the "party most involved in managing the licenses of the EMS Compositions." Order, RE.704, PageID#64287. As the district court summarized, "Kobalt granted licenses; it received license requests; it accepted NOIs; it collected royalties; and it was identified as the compositions' administrator time and time again." *Id.*

Eight Mile understood that pre-MMA databases like HFA's were the primary sources of ownership and administration information used by services like Spotify for licensing requests, and knew that leaving the EMS Compositions in Kobalt's name would lead industry participants to believe that Kobalt was the party with licensing authority. SUMF ¶ 181, RE.590-5, PageID#45193; *see* Order, RE.704, PageID#64287.

Eight Mile concluded internally that the licensing information in industry databases like HFA's was incorrect. In July 2015, Eight Mile's Catlett developed a "plan of attack" for updating the information in HFA's database by replacing Kobalt with Bridgeport. Plan of Attack Email, RE.627-21, PageID#51277-78. But Eight Mile chose to abandon that plan. Instead, at Eight Mile's direction, Kobalt remained the party registered with the EMS Compositions throughout industry databases like HFA's until just before, or even after, this lawsuit was filed more than four years later. SUMF ¶¶ 183-212, RE.590-5, PageID#45194-201.

Moreover, even though Eight Mile and Martin knew that the Compositions had been streaming on Spotify since 2011 and that Eight Mile had been receiving royalty and settlement payments from Spotify, Eight Mile did not take any step to assert its rights, object to or return

17

Spotify's payments, or protest Spotify's use of the EMS Compositions at any time before filing the lawsuit. *Id.* ¶¶ 63, 287-291, PageID#45157, 45225-26.

The district court, assessing these undisputed facts, concluded that Eight Mile "affirmatively fostered and failed to rectify the confusion surrounding its rights" and pursued a "wait-and-sue strategy." Order, RE.704, PageID#64281-83.

### D.    Kobalt Enters Into Agreements With Spotify.

Playing the role that Eight Mile assigned it to perform, Kobalt (1) participated in an industry-wide settlement agreement that released claims against Spotify relating to most of the EMS Compositions; and (2) then entered into a blanket mechanical license agreement with Spotify (the "2016 BMLA").

In 2014, three years after Eight Mile had allegedly transferred administration responsibility to Bridgeport, Eight Mile's lawyer directed Kobalt to participate in the NMPA's industry settlements. 2014 Settlement Direction, RE.625-4, PageID#50962.

One of those settlements was the March 2016 agreement between the NMPA and Spotify addressing the use of musical works for which

18

royalties had been accrued (but not yet paid). SUMF ¶ 311, RE.590-5, PageID#45231. Kobalt listed most of the EMS Compositions, including "Lose Yourself," when it made claims under the settlement in both 2016 and 2017. *Id.* ¶¶ 320-24; 331-32, RE.590-5, PageID#45234-35, 45237. Kobalt passed the settlement proceeds to Eight Mile and identified them as coming from Spotify. Eight Mile accepted that money without protest. *Id.* ¶¶ 277, 336, PageID#45221, 45239.

When it participated in the NMPA settlement, Kobalt also agreed to "engage in good faith negotiations to enter into a Direct License Agreement" with Spotify. NMPA-Spotify Agreement § 10(d), under seal at RE.338-18, pp.17-18. Those negotiations culminated in the 2016 BMLA, which provided that Kobalt would license Kobalt's entire catalog—that is, all compositions that Kobalt "owns, controls, or administers." 2016 BMLA §§ 1(e), 2(a), RE.625-14, PageID#51020.

While negotiating the 2016 BMLA, Spotify asked Kobalt for a list of covered compositions, but Kobalt refused. SUMF ¶¶ 346, 348, RE.590-5, PageID#45242. As a matter of "[m]usic industry practice," publishers like Kobalt generally refused to specify what compositions were covered by a blanket mechanical license. Order, RE.704, PageID#64279. While

Spotify did have some information about Kobalt's catalog because of HFA's databases (which associated Kobalt with most of the EMS Compositions), Spotify lacked additional visibility into the hundreds of thousands of compositions in Kobalt's catalog.

In light of this informational disparity, Spotify secured contractual representations and warranties by Kobalt, including that Kobalt "has the right and authority to grant the rights to Spotify in this Agreement." 2016 BMLA § 11(c), RE.625-14, PageID#51025-26. Those representations and warranties were backed by a broad indemnification provision. *Id*. § 12, PageID#51026.

### E.    Procedural History And Decision Below.

Eight Mile filed this lawsuit in August 2019, alleging that Spotify streamed recordings embodying the EMS Compositions without a license. Complaint, RE.1, PageID#1. Eight Mile amended its complaint to add claims against HFA. Amended Complaint, RE.97, PageID#783.

Spotify promptly notified Kobalt of the lawsuit and sought indemnification under the 2016 BMLA. Indemnification Notice, RE.625-16, PageID#51036. When Kobalt refused to honor its indemnity

20

obligations, Spotify brought claims against Kobalt. Third-Party Complaint, RE.91, PageID#712-34.

Following years of discovery, the parties filed cross-motions for summary judgment. On Eight Mile's claims, the district court granted Spotify's and HFA's motions and denied Eight Mile's. Order, RE.704, PageID#64294-95. The court also granted in large part Spotify's motion for summary judgment on its claims against Kobalt. *Id.*

The district court held that: (1) Eight Mile was barred by estoppel from pursuing its infringement claims against Spotify and HFA (*id.* at PageID#64284); and (2) Kobalt was obligated to indemnify Spotify under the 2016 BMLA (*id.* at PageID#64292).[4]

On estoppel, the district court concluded that "Spotify has established all of the substantive prerequisites for invoking estoppel here, and the underlying dynamics of the situation support such an application." Order, RE.704, PageID#64283. The court observed that it "is undisputed that Eight Mile Style was aware of Spotify's streaming

---

[4]    The indemnification ruling is not before this Court. This Court denied Kobalt's petition for certification of an interlocutory appeal. No. 24-0502, Dkt. 13 (Feb. 5, 2025). The district court also denied Kobalt's subsequent motion for entry of a final judgment on Spotify's claims. RE.754, PageID#66144.

of the EMS Compositions for several years before taking any affirmative steps to assert its rights" and that Eight Mile knowingly accepted royalties for that streaming. *Id.* at PageID#64270, 64273. Moreover, "Eight Mile Style knew that neither it nor Bridgeport had ever granted a license" and "that it had assigned its U.S. mechanical licensing rights to Bridgeport in an unusual agreement that it had not meaningfully publicized to others in the music industry—making confusion likely." *Id.* at PageID#64274.

On indemnification, the district court explained that the 2016 BMLA stated that Kobalt was licensing all compositions that it controlled or administered, and that the undisputed evidence showed that Kobalt administered the EMS Compositions. *Id.* at PageID#64284-92. Because Kobalt purported to license the EMS Compositions, that triggered its indemnification obligations under the contract.

The district court also concluded that Eight Mile did not convey an implied license to Spotify and that Kobalt lacked actual or apparent authority to license the EMS Compositions to Spotify in the 2016 BMLA. *Id.* at PageID#64263-65. The court held that an implied license could arise only if Eight Mile "actually meant to" license the compositions. *Id.*

at PageID#64267. And it stated that Spotify had not made the necessary showing of reliance to support apparent authority because (in the district court's view) it had not identified a specific employee who had personally relied on the 2016 BMLA. *Id.* at PageID#64263-64.

Finally, the court declined to render "any decision regarding the MMA"—including whether the MMA's blanket license authorized Spotify's use of the EMS Compositions after January 1, 2021. *Id.* at PageID#64238.

## SUMMARY OF ARGUMENT

1.    The district court correctly held that Eight Mile's misconduct bars its copyright infringement claims under the doctrine of estoppel.

The court applied the well-established and widely-applied legal framework for estoppel in the context of copyright infringement claims, which requires showing that (1) Eight Mile knew of Spotify's allegedly infringing conduct; (2) Eight Mile intended for Spotify to rely on its acts or omissions *or* that Spotify had a right to believe that Eight Mile so intended; (3) Spotify did not know the facts obscured by Eight Mile; and (4) Spotify relied on Eight Mile's conduct to its injury. *See Carson v.*

23

*Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003). Based on the undisputed record evidence, the court found each element of estoppel satisfied.

*First*, Eight Mile knew for years that its compositions were streaming on Spotify.

*Second*, Spotify had a right to believe that Eight Mile intended for Spotify and others to go to Kobalt to license the EMS Compositions. Eight Mile deliberately left the Compositions associated with Kobalt in industry databases, including HFA's—knowing that companies like Spotify rely on those databases for licensing. And Eight Mile chose not to notify anyone of the (on-paper) reallocation of licensing authority to Bridgeport.

*Third*, Spotify did not know—and had no way of knowing—of the undisclosed Bridgeport arrangement or of Eight Mile's position that Kobalt lacked authority to license the EMS Compositions when every public indication pointed to Kobalt.

*Fourth*, Spotify was injured by Eight Mile's misconduct, including by this lawsuit, which threatened statutory damages and attorneys' fees. That injury could have been avoided had Eight Mile taken any step to

24

assert that Spotify lacked authority to use the EMS Compositions during the eight years before this lawsuit was filed.

Eight Mile's other attempts to avoid the district court's estoppel holding all fail. Eight Mile did not object to Spotify's estoppel arguments in the district court on any of these grounds, which is reason enough to reject them. But Eight Mile's arguments also are wrong. This Court's precedents foreclose Eight Mile's assertion of waiver, and Eight Mile has come nowhere close to showing by clear and convincing evidence the egregious conduct needed to invoke unclean hands.

Finally, Eight Mile's fallback argument—that disputed issues of fact preclude summary judgment—should be rejected because the undisputed evidence supports application of estoppel as a matter of law. Contrary to Eight Mile's arguments, the district court did not make improper credibility determinations or weigh disputed evidence.

2.    This Court can also affirm on the alternative grounds raised in Spotify's conditional cross-appeal.

**Implied license.** Eight Mile's infringement claims are foreclosed because Spotify had an implied license to use the EMS Compositions. It is undisputed that Eight Mile both knowingly accepted royalties and

failed to object to Spotify's use of the EMS Compositions. Under nearly identical circumstances, courts have held that an implied license exists as a matter of law and that summary judgment is appropriate. The district court's contrary ruling rests on a legal error: the court required proof that Eight Mile had *subjective* intent to grant a license. But the test for whether an implied license exists is an *objective* one that turns on Eight Mile's outward-facing conduct—and the undisputed facts satisfy that test.

**Apparent authority.** The 2016 BMLA and Kobalt's participation in the NMPA-Spotify settlement authorized Spotify's use of the EMS Compositions because Kobalt acted with apparent authority from Eight Mile. The district court's determination that Spotify did not rely on Kobalt's conduct was based on a legal error: the court required Spotify to prove that *individual employees* believed Kobalt licensed the EMS Compositions via the 2016 BMLA—but the law requires only reliance by Spotify *as an entity*. That standard is met here: Spotify relied on Kobalt's statements asserting authority over the EMS Compositions, which Eight Mile deliberately failed to correct.

26

**MMA statutory blanket license.** Finally, the MMA's blanket license independently authorizes all use of the EMS Compositions by Spotify since the license availability date of January 1, 2021. The district court did not reach that issue, but it presents a pure question of statutory interpretation that this Court can resolve.

## STANDARD OF REVIEW

This Court "reviews a district court's grant of summary judgment *de novo.*" *Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 767 (6th Cir. 2005). The same de novo review applies to the district court's denial of summary judgment on legal grounds. *Thomas v. United States*, 166 F.3d 825, 828 (6th Cir. 1999).

## ARGUMENT

## I.    The District Court Correctly Held That Eight Mile's Claims Are Barred By Estoppel.

Eight Mile's brief barely acknowledges the key undisputed facts that led the district court to hold that Eight Mile's claims are barred by estoppel.

Eight Mile, among other things:

- Entered into "an unusual arrangement" purporting to assign its licensing rights to Bridgeport, yet took "none of the ordinary, customary steps to inform third parties of that change";

- Continued "to openly receive licensing requests through its old U.S. mechanical licensing administrator, Kobalt, which also publicly performed the most prominent recurring function that one would expect an administrator to perform—collecting royalties";

- Was "fully aware of the understandable confusion that its actions had fostered" and developed an internal "plan of attack" to change the information that was publicly available, but chose instead to do "nothing"; and

- Failed to "update databases" or "send a belated [Letter of Direction]" apprising HFA and other organizations that Kobalt no longer had licensing authority; or even to "send Spotify a single cease-and-desist letter" asserting its position that it objected to Spotify streaming the Compositions.

Order, RE.704, PageID#64277-78.

Having no answer to these undisputed facts, Eight Mile resorts to attacking the legal standard applied below, caricaturing the district court's analysis, and raising a handful of objections to application of estoppel. All of Eight Mile's arguments are wrong.

## A. The district court applied the correct framework for equitable estoppel.

Estoppel is a "well-established copyright defense" that bars a plaintiff from recovery because of "the plaintiff's inequitable conduct." Order, RE.704, PageID#64268-70. Because this Court has not yet addressed the test for equitable estoppel in the copyright context, the

district court applied a four-part test endorsed by other courts of appeals, numerous district courts, and a leading treatise:

> (1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury.

*Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) (citing 4 Nimmer on Copyright § 13.07 (2002)); *see also id.* (collecting cases); *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960). The Second Circuit recently endorsed a virtually identical formulation in a case that Eight Mile itself cites. *See ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022) (cited at EMS Br. 25).

Estoppel may be based on the plaintiff's affirmative actions or "a plaintiff's silence and inaction." *Carson*, 344 F.3d at 453 (citing 4 Nimmer § 13.07); *see also ABKCO*, 50 F.4th at 321 (holding that a plaintiff's culpable conduct can consist of "omissions" and the "fail[ure] to act"). Eight Mile concedes (Br. 33) that this Court's precedents from the patent context establish that estoppel can be based not only on "acts of misconduct" but also "intentionally misleading silence." *TWM Mfg. Co. v. Dura*, 592 F.2d 346, 350 (6th Cir. 1979); *see also* Restatement (Second) of

Torts § 894(2) & cmt. e (1979) ("silence has the legal effect of a misrepresentation" when a party "could easily inform the other of his mistake but makes no effort to do so").

Eight Mile nonetheless argues that omissions or inaction cannot support estoppel. That argument is unavailing, both because Eight Mile's culpable conduct consisted of affirmative acts as well as omissions (*see* Appeal Part I.B.2, *infra*), and because the law is clear that omissions can support estoppel.

Neither of Eight Mile's cases supports its contrary position.

*First*, Eight Mile cites *Michigan Express*, a case involving the very different context of estoppel against the government. *Michigan Express, Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004) (cited at EMS Br. 30, 32). The "government … 'may not be estopped on the same terms as any other litigant,'" and estoppel against the government requires "demonstrat[ing] some 'affirmative misconduct' by the government in addition to the other estoppel elements." *Id*. (citation omitted). This Court therefore did not have occasion to address whether misleading silence can justify estoppel outside the governmental context. *Michigan Express* therefore says nothing about the standard for estopping a private

party in copyright-infringement cases—and doesn't justify deviating from the estoppel test recognized by other courts.

*Second*, Eight Mile insists that the Supreme Court's brief discussion of estoppel in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), narrowed the doctrine "to instances of affirmative misrepresentations concerning the plaintiff's abstention from suit." EMS Br. 21. Eight Mile seizes on one sentence in *Petrella* stating that estoppel may apply "when a copyright owner engages in intentionally misleading representations concerning his abstention from suit." 572 U.S. at 684.

Eight Mile mischaracterizes *Petrella*. The question presented there was limited to application of laches—the lower courts had not even addressed estoppel. *Id.* at 676, 684 n.21. The Supreme Court was simply explaining the distinction between estoppel and laches and reaffirming the continued vitality of the estoppel defense "to bar the copyright owner's claims completely." *Id.* at 684-85. Nothing in that single sentence purported to redefine the metes and bounds of estoppel doctrine or silently overrule prior cases applying the doctrine in situations involving misleading omissions.

Indeed, since *Petrella*, courts—including the Second Circuit—have continued to use the test adopted by the district court. *See*, *e.g.*, *ABKCO*, 50 F.4th at 321; *Sanborn Library LLC v. ERIS Info., Inc.*, 2024 WL 1744630, at *4 (S.D.N.Y. Mar. 25, 2024) (report and recommendation); *Viper Nürburgring Record LLC v. Robbins Motor Co., LLC*, 2019 WL 4256372, at *10 (D. Kan. Sept. 9, 2019). These courts also confirm that a copyright plaintiff's "silence and inaction" can support estoppel. *Viper*, 2019 WL 4256372, at *10; *accord Sanborn*, 2024 WL 1744630, at *4-5.

## B.    The district court correctly concluded that undisputed facts establish each element of estoppel.

The district court correctly applied the proper four-part test for estoppel to the undisputed facts.

### 1.    Eight Mile knew of Spotify's allegedly infringing conduct for years.

Eight Mile concedes that it knew that Spotify had been streaming the EMS Compositions since 2011 and that it was receiving royalties from Spotify. SUMF ¶¶ 63, 287-291, RE.590-5, PageID#45157, 45225-26. Eight Mile advertised those royalties to investors back in 2012, stating that it "receives royalty payments" based on "the frequency with which the recordings and/or songs are streamed over sites such as Spotify." Prospectus, RE.619-10, PageID#49771.

Eight Mile's only response is that while it knew Spotify was streaming the EMS Compositions, it was under the impression that Spotify had a license to do so. EMS Br. 33-36. This argument turns entirely on Joel Martin's summary judgment declaration—drafted *after* his deposition in this case. The district court rightly rejected this self-serving declaration as wholly "implausible." Order, RE.704, PageID#64272.

District courts have discretion to disregard "implausible" testimony at summary judgment; doing so "does not amount to an improper weighing of the evidence." *Fogerty v. MGM Holdings Corp.*, 379 F.3d 348, 355 (6th Cir. 2004) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)). If "[n]o rational trier of fact could rely on" a statement to find in a party's favor, that statement cannot create a genuine factual issue precluding summary judgment. *Id.* As the Supreme Court has put it, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

It is also settled that "'a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition)[.]'" *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012) (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)).

The district court properly applied those principles in holding that Martin's declaration did not negate the undisputed evidence establishing the first prong of the estoppel test.

As an initial matter, Eight Mile is run by Martin, an experienced music industry participant, and its entire business is to manage and monetize a lucrative and relatively small catalog of 242 compositions (including well-known music by Eminem). Order, RE.704, PageID#64273. For those reasons alone, "the idea that a multimillion-dollar operation like Eight Mile Style would, for years, simply not bother to do the rudimentary legwork to find out whether its core assets were

being wrongfully exploited on the scale at issue here is close to unthinkable." *Id.* at PageID#64273-74.[5]

Examined against the backdrop of the undisputed record, the specific statements in Martin's declaration on which Eight Mile relies only underscore the implausibility of Martin's account.

*First*, Martin's declaration said he believed until 2018 that Universal Music Group (Eminem's record label) had issued a pass-through license. Martin Decl., RE.659-2, PageID#58371. But on this point, Martin's declaration squarely contradicted his earlier deposition testimony in this case that "Universal had no authority to enter" into a pass-through license. Martin Dep., RE.653-3, PageID#56313 (unredacted at RE.420-3). Indeed, he acknowledged that Eight Mile filed a "big public lawsuit" against Universal (and a similar lawsuit against Apple) for unauthorized pass-through licenses. *Id.*, RE.670-15, PageID#61159. And the 2012 settlement of the Universal lawsuit required Eight Mile's approval for all licenses after 2012, with any pre-2012 pass-through

---

[5]    Eight Mile's unsupported suggestion (Br. 36) that the fact that it "has only two employees" might lead it to be unsure about the licensing of the EMS Compositions cannot be squared with its expertise, business model, and the undisputed record evidence.

license expiring "at or around 2016." *Id.*, RE.653-3, PageID#56308; UMG Settlement, under seal at RE.428-9, at pp.A-2, A-3.

The court's rejection of Martin's attempt to contradict his deposition testimony was entirely appropriate. *See White*, 699 F.3d at 877. That contradiction alone justifies the district court's decision to disregard Martin's declaration.

The district court also properly recognized that "it is highly implausible that Martin was ever in the dark regarding whether UMG licensed the EMS Compositions to Spotify." Order, RE.704, PageID#64272. Eight Mile never bothered to *ask* Universal about such a license, confirming that Martin either knew Universal had no licensing authority or that he chose to remain willfully ignorant. Either way, there is no contemporaneous support for Martin's post-litigation (and post-deposition) assertions about his past beliefs.

*Second*, Martin's declaration also said he believed that there must have been "valid compulsory licenses" in place based on Eight Mile's receipt of royalties from HFA. Martin Decl., RE.659-2, PageID#58371. But the district court properly rejected that excuse as implausible too, because "no rational trier of fact could rely on this statement" (*Fogerty*,

379 F.3d at 355) to support Eight Mile's contentions. If, as Eight Mile contended, it (or Martin-controlled Bridgeport on its behalf) had sole licensing authority, then Eight Mile would know whether it had licensed the works to major streaming services like Spotify. As the court explained, it is "impossible to believe that anyone at Eight Mile Style could have thought that HFA knew more about Eight Mile Style's rights than it did." Order, RE.704, PageID#64273.

Leaving aside its misplaced reliance on Martin's declaration, Eight Mile's brief omits key facts that underscore Eight Mile's knowledge of the potential for infringement. For example, Eight Mile received NMPA settlement money from Spotify in 2016, with the relevant payments specifically marked as "Spotify Settlement" and Kobalt's cover letter identifying Google, Spotify and SoundCloud as sources of settlement funds. SUMF ¶¶ 277, 336, RE.590-5, PageID#45221, 45239. After that point, Eight Mile couldn't have been ignorant that its works were on Spotify or that Spotify had paid Eight Mile settlement monies to resolve allegations of copyright infringement.

Eight Mile also notes in passing (Br. 14 n.4) the *Ferrick* class-action settlement, but fails to mention that Eight Mile opted out from that

settlement in September 2017. *See Ferrick v. Spotify USA, Inc.*, No. 16-cv-8412, Dkt. 287 (S.D.N.Y. Nov. 13, 2017). That opt-out further demonstrates that Eight Mile was aware that it might possess infringement claims against Spotify—indeed, had affirmatively attempted to preserve them—and renders wholly implausible the implication in Martin's declaration that Eight Mile could have believed after September 2017 that any infringement claims were precluded by a pre-MMA license.

### 2. Eight Mile's conduct directed would-be licensees (like Spotify) to go to Kobalt.

The second estoppel prong can be established in either of two ways: Eight Mile must have acted in such a way that (a) Spotify, as the party asserting estoppel, had a right to believe—based on Eight Mile's objective actions—that Eight Mile intended licensing to go through Kobalt; *or* (b) Eight Mile must have intended that licensees go to Kobalt. *See, e.g.*, *ABKCO*, 50 F.4th at 321; *Carson*, 344 F.3d at 453. Both were demonstrated here.

**a.** The first standard was met because Eight Mile's conduct gave Spotify a right to believe that Eight Mile intended everyone seeking

licenses to, in Martin's own words, "go through Kobalt." Martin Dep., RE.619-8, PageID#49728-29.

Eight Mile concedes that it had expressly authorized Kobalt to license the EMS Compositions prior to the undisclosed 2011 Eight Mile-Bridgeport-Kobalt arrangement. SUMF ¶¶ 90-92, RE.590-5, PageID#45164-65; *see* EMS Br. 8 n.2. By directing Kobalt to register with HFA and other relevant databases, Eight Mile took affirmative steps to establish Kobalt as the go-to entity for licensing the EMS Compositions to HFA, Spotify, and the rest of the industry. Further, Eight Mile chose to leave Kobalt registered with HFA and other prominent organizations, including MRI (HFA's chief competitor), ASCAP, and BMI. SUMF ¶¶ 183-191, 199-212, RE.590-5, PageID#45194-45201.[6]

Neither Eight Mile nor Bridgeport ever notified anyone about the purported reallocation of licensing responsibilities to Bridgeport. The 2011 agreement between Bridgeport and Eight Mile included a draft LOD designed to inform third parties of the changes in licensing rights.

---

[6]     To stream a composition, a streaming service also needs a separate performance license, which often comes from different licensors than a mechanical license. ASCAP and BMI are the principal performing rights organizations in the United States. *See Broadcast Music*, 396 F.3d at 765.

39

Bridgeport-Martin Affiliated Agreement, under seal at RE.332-20, p.27. But Eight Mile and Bridgeport chose never to send it. SUMF ¶ 113, RE.590-5, PageID#45171.

To the contrary, on the same day the Eight Mile-Bridgeport agreement was executed, *Kobalt* sent a separate LOD to HFA saying that Kobalt had entered into an "exclusive administration agreement" with Eight Mile and "all statements, payments, *license requests*, correspondence and inquiries should be remitted to" Kobalt. Kobalt LOD, RE.624-5, PageID#50815 (emphasis added). Kobalt never rescinded that letter.

Eight Mile again chose in July 2015 to maintain those designations. That is when Eight Mile's day-to-day manager, Sarah Catlett, developed a "plan of attack" for updating the information in HFA's database. Plan of Attack Email, RE.627-21, PageID#51277-78. The two-part plan was to (1) "tie[]" the EMS Compositions to Eight Mile by registering them in Eight Mile's name with HFA "so people know to come to [Eight Mile/Martin Affiliated] directly for licenses"; and (2) have Kobalt prepare a letter "remov[ing] Kobalt as publisher of record" in HFA's databases.

*Id.* Catlett's plan was sent to both Eight Mile's outside counsel and Kobalt's general counsel. *Id.*

Yet Eight Mile and Kobalt abandoned the plan. Instead, they left most of the EMS Compositions in Kobalt's name in industry databases, including HFA's. SUMF ¶¶ 183-212, RE.590-5, PageID#45194-201. And the day-to-day operations remained the same, both privately and publicly: "Kobalt granted licenses; it received license requests; it accepted NOIs; it collected royalties; and it was identified as the compositions' administrator time and time again." Order, RE.704, PageID#64287.

Only in June 2019—two months before filing this lawsuit—did Eight Mile finally start to update the databases and list Eight Mile (notably, not Bridgeport, despite what the contracts and the draft LOD said) as responsible for the EMS Compositions. SUMF ¶¶ 301-10, RE.590-5, PageID#45228-31. In other words, prior to June 2019, Eight Mile held out Kobalt to the music industry as the party authorized to act on Eight Mile's behalf, and all appearances were that Kobalt was doing so. Even *Eight Mile's own expert* said that she would have had "high confidence" that Kobalt had licensing authority over the Compositions

based on the information in HFA's database in 2018. Corton Dep., RE.623-7, PageID#50691-93.

In its brief, Eight Mile largely ignores this substantial undisputed evidence of its affirmative acts, instead attacking a strawman when it repeatedly asserts that the district court purported to apply estoppel based on Eight Mile's "silence and delay alone." EMS Br. 37; *see id.* at 1, 32, 33, 38-39. Eight Mile's affirmative acts clearly suffice by themselves; its intentional omissions simply provide additional support.

Eight Mile also argues that it should be excused from failing to update the information in HFA's database until 2019 by asserting that HFA could not accommodate the division of authority between licensing authority and royalty collection. EMS Br. 9-11. But Eight Mile's argument is irrelevant to the objective test for satisfying the second estoppel prong because it at best goes to Eight Mile's actual intent, not the objective appearance of Kobalt's licensing authority created by Eight Mile's conduct.[7]

---

[7]    Eight Mile's assertion is also false. HFA's witness explained that at least as far back as 2013, HFA's systems could accommodate upon request a "distinction between the entity with licensing authority and who would be paid on the composition." Smith Dep., RE.660-16, PageID#58960-61. Yet Eight Mile never made any such request. Eight

Similarly, Eight Mile's brief mostly attacks the district court's discussion of Eight Mile's intent. EMS Br. 37-42. Those arguments are wrong, as we discuss below, but are also irrelevant because there was no need for the district court to reach that issue; whatever Eight Mile's intent, Eight Mile's conduct created the objective appearance that Kobalt was responsible for the EMS Compositions, and therefore Spotify "ha[d] a right to believe that" Eight Mile intended potential licensees like Spotify to go to Kobalt for licenses. *Carson*, 344 F.3d at 453. That is enough to satisfy the second estoppel prong.

**b.** The second estoppel prong is met for the additional reason that Eight Mile actually intended for Spotify to rely on its conduct. While the Court need not reach the issue, the undisputed evidence shows that Eight Mile *wanted* industry participants to go through Kobalt, despite the on-paper reallocation of licensing authority. As Martin testified, "*[e]verything ha[d] to go through Kobalt*"—not Bridgeport—and "*the*

---

Mile also offers no explanation why this supposed technical limitation in HFA's systems in 2011 would justify Eight Mile doing nothing until 2019—or why Eight Mile also took no steps to update other industry databases before 2019.

*intent was [to] send [licensing requests] to Kobalt*." Martin Dep., RE.619-8, PageID#49728-29 (emphases added).

Eight Mile's day-to-day manager Catlett likewise testified that the 2011 agreements with Bridgeport didn't actually change how the catalog was managed in the U.S. In her words, "nothing had changed"; Kobalt was "still an administrator for the Eight Mile Style catalog" at the time of her deposition in August 2021. Catlett Dep., RE.622-3, PageID#50062, 50095. And shortly after the 2011 arrangement, Kobalt's CFO stated in an e-mail to Kobalt's CEO that "Bridgeport [would be] 'admining' North America, *with us actually doing it*." Kobalt 2011 Internal Email, RE.624-4, PageID#50812 (emphasis added). In other words, Kobalt would keep administering the EMS Compositions in North America, just as both Eight Mile and Kobalt intended.

Eight Mile's design—putting Kobalt forward as its intended contact for mechanical licensing, while privately withdrawing Kobalt's formal authority to actually issue mechanical licenses—put would-be licensees at risk of copyright infringement claims. The district court correctly determined that Eight Mile intended that result. As the district court explained, the only way Eight Mile's "otherwise confounding behavior

makes sense" is that Eight Mile engaged in "culpable conduct" to pursue its strategy of "opportunistic litigation." Order, RE.704, PageID#64275-77. Eight Mile could have "simply sent a single, clear cease-and-desist letter—as countless other rights holders, many far less well-resourced than Eight Mile Style, do every year." *Id.* But Eight Mile "was aware of the money to be made as a victim of infringement," so it pursued a strategy of seeding litigation instead of communicating its view that Kobalt no longer had licensing authority. *Id.*

Eight Mile is therefore wrong in asserting (Br. 37-39) that the district court required it to provide a valid business reason for its actions. Rather, the court drew the only inference it found permissible based on the undisputed record: the only plausible reason for Eight Mile's conduct was to sandbag Spotify with a lawsuit seeking huge statutory damages.

On appeal, Eight Mile protests that it would not have intentionally waited to sue until after the MMA went into effect because the MMA's limitation on liability could prevent Eight Mile from recovering statutory damages or attorneys' fees. EMS Br. 40-42. Eight Mile's argument is belied by the fact that, in the district court, Eight Mile aggressively challenged the constitutionality of the MMA's limitation on liability from

the start. *See* Compl. ¶¶ 8-9 & Prayer for Relief(D), RE.1, PageID#5-6, 30-31. It pushed for the district court to address the MMA issues in the liability phase of the bifurcated proceedings. Proposed Case Management Order, RE.88, PageID#673. And it devoted considerable attention to that challenge below, devoting nearly a third of its summary judgment brief to the issue. EMS MSJ, RE.566, PageID#42753-69. That challenge also prompted the federal government to intervene to defend the statute's constitutionality. U.S. Br., RE.550, PageID#42091-120.

As the district court explained, waiting to file this action until it could challenge the MMA's limitation on liability was in Eight Mile's economic self-interest. Invalidating the statute could have had broad "implications for the economy of music" (Order, RE.704, PageID#64277) and opened the door for Eight Mile to bring litigation against other streaming services—or to use the threat of litigation to extract a windfall above compensation at the statutory royalty rate.

Finally, Eight Mile's brief fails to mention its attack in the district court on the scope of the MMA's blanket license. That silence speaks volumes. If successful, Eight Mile's attempts to undermine the MMA's blanket license could allow Eight Mile to use the threat of litigation to

46

demand large sums from streaming services for post-2021 uses of the works, further explaining its litigation tactics.

Thus, while this Court need not reach the issue, the district court was right to determine that Eight Mile intended for Spotify to rely on its conduct—thus generating the potential for a copyright infringement lawsuit that would give it leverage by threatening to invalidate, or at a minimum narrow, the MMA.

### 3. Spotify did not know of the facts that Eight Mile deliberately obscured.

It is undisputed that Eight Mile never told Spotify about the unique, one-of-a-kind purported allocation of rights to Bridgeport or that Kobalt lacked authority to license the EMS Compositions. On the contrary, as discussed above, Spotify had every reason to believe it had properly licensed the Compositions: Eight Mile continued to associate Kobalt with the EMS Compositions in the databases of HFA and other major organizations—as it had done when Kobalt had actual authority— and Eight Mile accepted royalty payments without objection for years.

Eight Mile relies on three isolated emails between Kobalt and HFA (*not* EMS or Spotify) sent between August 2013 and February 2016. EMS Br. 11, 46. But as the district court observed, "[n]one of the cited

47

communications actually informed HFA that Spotify lacked a license for the EMS Compositions." Order, RE.704, PageID#64279.

*First*, industry experts agreed that "music industry practice calls on publishers to inform key parties of changes in the allocation of rights through clear, formal LODs." *Id.*; *see* SUMF ¶ 110, RE.590-5, PageID#45170. By contrast, the emails were "largely informal communications between ordinary employees related to discrete issues at particular times." Order, RE.704, PageID#64279.

*Second*, Eight Mile never sent a formal LOD to HFA or any other organization—even though both Eight Mile and Kobalt expressly recognized the need for one in Catlett's (abandoned) "plan of attack." Plan of Attack Email, RE.627-21, PageID#51277-78. In other words, neither Eight Mile nor Bridgeport provided the updated information necessary to inform HFA and other organizations (much less Spotify) of the change in licensing authority. Indeed, Martin testified that he directed Bridgeport *not* to register the EMS Compositions with HFA and other organizations. Martin Dep., RE.619-8, PageID#49703. Similarly, Kobalt's general counsel conceded that Spotify would have no way of knowing that "Kobalt has a collection-only role with respect to a

particular catalog of compositions." Arnay Dep., RE.622-8, PageID#50342.

*Third*, the emails on which Eight Mile relies all *preceded* Kobalt's participation in the NMPA-Spotify settlement, during which Kobalt affirmatively claimed most of the EMS Compositions, including "Lose Yourself," in files it sent directly to Spotify. SUMF ¶¶ 320-24; 331-32, RE.590-5, PageID#45234-35, 45237. After the Kobalt-HFA emails, Kobalt also sent HFA what it said was an "authoritative" statement of its interest in the Compositions—compositions that Kobalt said that it "control[led]." *Id.* ¶¶ 325-29, PageID#45235-37. So even if the Kobalt-HFA emails could have put Spotify on notice that Kobalt lacked licensing authority (and they didn't for the reasons above), those e-mails were superseded by Kobalt's later, definitive representations in connection with the NMPA settlement.

*Fourth*, although the district court did not need to address the point, even if the HFA emails were effective notice as to HFA, they were ineffective as to Spotify because HFA wasn't Spotify's agent for licensing services, and therefore any knowledge based on the emails could not be imputed to Spotify. Eight Mile failed to show below—much less explain

49

convincingly in this Court—that Spotify had sufficient control over HFA to create an agency relationship.

*Finally*, Eight Mile is wrong in asserting (Br. 11, 46) that HFA's "response files"—massive electronic data files generated from HFA's databases—communicated the contents of Kobalt's emails to Spotify. The response files simply communicated the licensing information that was available in HFA's databases (Spotify Resp. to EMS SUMF ¶ 70, RE.651-2, PageID#55947), and as noted above, due to Eight Mile's actions, those databases largely pointed to Kobalt as being responsible for the EMS Compositions. HFA has therefore disclaimed ever "advis[ing] Spotify … that Kobalt did not have licensing authority with respect to the EMS Compositions generally." HFA Resp. to EMS SUMF ¶ 70, RE.626, PageID#51075-76.

### 4. Spotify was injured as a result of Eight Mile's culpable conduct.

The injury to Spotify from Eight Mile's acts and omissions creating the false impression regarding licensing authority "is self-evident." Order, RE.704, PageID#64280. Spotify faced "strikingly high" potential liability, including statutory damages and attorneys' fees, from litigation that could have been avoided had Eight Mile "simply taken the ordinary

step that rights holders across the country take every day and simply told Spotify to stop." *Id.* at PageID#64281; *see also*, *e.g.*, *Field v. Google*, 412 F. Supp. 2d 1106, 1117 (D. Nev. 2006) (this element of estoppel was satisfied when the parties could "have avoided the present lawsuit entirely" if the plaintiff had communicated his position beforehand).

Specifically, if Eight Mile had ever told Spotify of its view that Kobalt lacked authority to license the EMS Compositions, the parties could have either tried to negotiate a voluntary license (Order, RE.704, PageID#64275-76) or Spotify could have taken the works off its service (*see Viper*, 2019 WL 4256372, at *11 (had plaintiff asserted its position, defendant could have removed the photographs from its website and online postings)).

Eight Mile argues that Spotify's continued use of the EMS Compositions after this lawsuit was filed purportedly shows that Spotify would neither have sought a license nor taken down the infringing works, and therefore could not have been injured as a result of Eight Mile's conduct. EMS Br. 16, 29, 55. But—tellingly—Eight Mile fails to disclose two points that vitiate its argument.

51

*First*, to avoid a dispute over whether the EMS Compositions would remain on Spotify's service after the filing of this litigation, the parties entered into a standstill agreement providing that Eight Mile would not pursue claims for infringement for use of the Compositions between September 27, 2019 and the termination of the standstill agreement (which occurred on June 22, 2021). Standstill Agreement, under seal at RE.439-14, pp.2-3; Termination Email, under seal at RE.439-16, p.2. The standstill thus allowed Spotify to keep the Compositions on its service for the standstill period regardless of what happened with Eight Mile's infringement claims.

*Second*, on January 1, 2021—well before the termination of the standstill agreement—the MMA's blanket license went into effect and independently authorized Spotify's continued use of the Compositions after that date. *See* pages 74-81, *infra*.

Eight Mile's failure to mention either of these two points underscores that its description of Spotify's practices cannot be taken at face value—and that EMS's argument that Spotify wasn't injured is meritless.

### 5. Eight Mile fails to identify a triable issue of material fact.

Eight Mile's fallback argument that the district court should have sent estoppel to a jury (Br. 49-55) also fails. As Eight Mile acknowledges (*id.* at 49), it is appropriate to decide estoppel as a matter of law when undisputed evidence warrants application of the doctrine. *See J.C. Wyckoff & Assocs. v. Standard Fire Ins.*, 936 F.2d 1474, 1493 (6th Cir. 1991).

For the reasons just explained, the district court's estoppel analysis did not rest on improper credibility determinations or weighing of disputed evidence. There were no jury questions about "whether Eight Mile knew of infringement" (EMS Br. 51), because the district court properly rejected Martin's self-serving declaration. Similarly, the undisputed evidence showed that Eight Mile created a false impression surrounding licensing rights to the EMS Compositions by failing to disclose the Bridgeport arrangement and leaving the Compositions associated with Kobalt in all major industry databases after previously directing Kobalt to register, and that Eight Mile deliberately chose not to correct that impression.

Finally, Eight Mile's assertion that there was a jury question about unclean hands (*id.*) ignores that—as we discuss below (at 57-61)—Eight Mile waived its unclean-hands argument by failing to raise it in the district court, and that Eight Mile hasn't come close to establishing unclean hands, let alone that resolving the issue turns on a disputed issue of material fact.

**C.  Eight Mile's other attempts to avoid estoppel fail.**

**1.  Eight Mile's waiver argument is baseless.**

Eight Mile's one-paragraph waiver argument (Br. 26) is meritless.

Eight Mile never asserted waiver below, either in its briefs or at the summary judgment hearing. That is reason enough to reject its assertion of waiver. *See Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1002 (6th Cir. 1994) (refusing to consider waiver argument raised "for the first time" on appeal).

If the Court nevertheless considers Eight Mile's argument, it is wrong. Spotify's estoppel defense was fully raised below: its summary judgment motion expressly argued equitable estoppel. Spotify MSJ, RE.553, PageID#42218. Eight Mile also responded to Spotify's estoppel defense in its opposition (EMS Opp., RE.567, PageID#42815-16), and the

54

parties discussed estoppel during the summary judgment hearing (Hearing Tr., RE.735, PageID#65848-66015).

Eight Mile protests that Spotify did not repeat its estoppel argument in its opposition to Eight Mile's cross-motion for summary judgment. But the opposition expressly incorporated Spotify's discussion of its affirmative defenses in its own motion. Spotify Opp., RE.556, PageID#42299-300.[8]

Finally, the district court's consideration of the estoppel issue itself precludes waiver. A summary judgment argument is not waived—even if, unlike here, it was raised for the first time in a reply brief in the district court—"when 'the district court fully addressed the argument in its order and [when] both parties fully briefed the issue on appeal.'" *Bledsoe v. Tennessee Valley Auth.*, 42 F.4th 568, 585 n.3 (6th Cir. 2022) (citation omitted).

---

[8]     Eight Mile's sole cited case did not involve waiver; it reflects only the common-sense proposition that a party's argument for summary judgment "is not interchangeable" with an argument that disputed issues of fact create a "'genuine issue for trial.'" *Central Ill. Pub. Serv. Co. v. Atlas Mins., Inc.*, 146 F.3d 448, 452 (7th Cir. 1998).

## 2. The district court properly addressed equitable estoppel at the liability stage.

Eight Mile argues that, because the district court had ruled that it would determine whether any infringement was willful at a later damages stage, Eight Mile had no opportunity to develop arguments about Spotify's knowledge and the district court resolved the estoppel issue too soon. EMS Br. 55-56.

Eight Mile never raised this argument in the district court, so its argument is waived. *E.g.*, *Jolivette v. Husted*, 694 F.3d 760, 770 (6th Cir. 2012) ("As a rule, we will not review issues if they are raised for the first time on appeal.").

In addition, Eight Mile ignores that it had a full and fair opportunity to take discovery, which unfolded over many years. If Eight Mile wanted to seek additional facts to respond to Spotify's equitable estoppel argument, it was required to object on that ground under Rule 56(d) and explain what additional facts it needed. *E.g.*, *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488-89 (6th Cir. 2000) ("The importance of complying with Rule 56(f) [now Rule 56(d)] cannot be overemphasized."). It failed to do so.

Finally, under the district court's bifurcation order, the first stage covered all liability issues. Bifurcation Order, RE.89, PageID#686-87. It is well-settled that equitable estoppel is a defense to liability that can "bar the copyright owner's claims completely" and thus was appropriately litigated in the first stage of the proceeding. *Petrella*, 572 U.S. at 684.

### 3. Spotify was not barred by unclean hands from asserting estoppel.

Eight Mile's invocation of unclean hands (Br. 26-29) also fails.

Eight Mile has the burden of establishing unclean hands (*see Schnadig Corp. v. Gaines Mfg. Co.*, 494 F.2d 383, 392 (6th Cir. 1974)), but it never raised unclean hands below, in response to Spotify's estoppel argument or otherwise. Eight Mile's unclean-hands argument is therefore waived. *See Jolivette*, 694 F.3d at 770.

Even if the argument had been preserved, Eight Mile comes nowhere close to meeting its burden. Eight Mile must show "particularly egregious conduct" (*TWM Mfg.*, 592 F.2d at 349) that amounts to "bad faith" (*Cleveland Newspaper Guild, Local 1 v. Plain Dealer Publ'g Co.*, 839 F.2d 1147, 1155 (6th Cir. 1988)). A "party's hands need not be as clean as snow to avoid the unclean hands doctrine." *Pinkette Clothing,*

*Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1029 (9th Cir. 2018).[9] And the misconduct must be "relative to the matter" at issue—in other words, relate to Eight Mile and *its* infringement claims. *Cleveland Newspaper Guild*, 839 F.2d at 1155.

Eight Mile's arguments fall far short of meeting those demanding standards. *First*, this case stands in sharp contrast to the principal case Eight Mile cites, in which the defendant could not invoke estoppel *after receiving a cease-and-desist letter* from the plaintiff. *Elvis Presley Enters. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). Sending a cease-and-desist letter (or placing a phone call or sending an email) before filing suit is exactly what Eight Mile *didn't do* here.[10]

---

[9]    Other courts similarly require evidence of fraud, willful misconduct, unconscionability, or bad faith to establish unclean hands. *See*, *e.g.*, *Kars 4 Kids Inc. v. America Can!*, 98 F.4th 436, 451 (3d Cir. 2024); *Pinkette Clothing*, 894 F.3d at 1029; *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620-22 (5th Cir. 2013); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992).

[10]    Similarly, in *TWM Manufacturing* this Court explained that a patent infringement defendant could not invoke laches if the plaintiff could prove at trial that the defendant engaged in "deliberate, calculated plagiarism" to copy the plaintiff's invention and sponsored third-party litigation to "harass" the plaintiff. 592 F.2d at 349. Eight Mile hasn't proven anything of the sort here.

*Second*, Eight Mile's aspersions on Spotify's business model are not evidence of unclean hands because they do not relate to Eight Mile's specific infringement claims (and they are also wrong). The same is true of Eight Mile's focus on the time period surrounding Spotify's launch in 2011; as Eight Mile concedes, its claims are subject to "the Copyright Act's three-year statute of limitations." EMS Br. 3.[11]

Nor is there support in the record for Eight Mile's assertion (Br. 28) that "Spotify knew that Kobalt had not given Spotify a license, and

---

[11]    Eight Mile's criticisms are also grossly inaccurate. Perhaps most egregiously, Eight Mile mischaracterizes a public statement by Spotify's CEO when it says that Spotify sought to maximize the number of tracks on its service at launch without regard to licenses. EMS Br. 12. Spotify's CEO was describing the mindset of *consumers* that had led to widespread piracy and to, for example, "Game of Thrones [being] the most pirated TV show ever." Video Interview, RE.665-16, PageID#60180 (manually lodged). Here is the actual statement with Eight Mile's omitted language in bold:

> **I think again, as a consumer**, I want all the world's content to be readily available the moment they release it. **I'm not going to accept in the future, that it takes a year for a great TV show like Game of Thrones to make it over to Europe if I'm there.** I'm not going to accept that **it's, you know,** there is all this content that I want to access, **if I'm a German guy living in the U.S.** and I can't.

*Id.* Spotify pointed out below that Eight Mile offered the same mischaracterization in its summary judgment motion (Spotify Opp., RE.556, PageID#42292), but Eight Mile unfortunately has chosen to double down on its selective quotation before this Court.

streamed anyway." On the contrary, the undisputed evidence shows that Spotify *did not know* of the undisclosed transfer of licensing authority from Kobalt to Bridgeport and that Kobalt remained associated with the Compositions in industry databases like HFA's. *See* pages 47-50, *supra*. Thus, at minimum the 2016 Kobalt BMLA provided Spotify a good-faith basis for using the Compositions within the limitations period. *See Cleveland Newspaper Guild*, 839 F.2d at 1155 ("asserting a legal defense" in good faith doesn't support unclean hands).

*Third*, Eight Mile spills considerable ink on its contrived theory attacking Spotify's automated process for issuing NOIs (Br. 2, 14, 16-17, 27-29, 43, 55), but there was nothing misleading about that process. Every time HFA located a new match to a publisher that was not an HFA affiliate and did not have a direct license with Spotify, HFA would automatically generate and send an NOI and pay the associated royalties, including any accrued royalties for previously unmatched usage. HFA SUMF ¶¶ 28-33, under seal at RE.322, pp.8-10. Thus, the NOI process facilitated the payment of statutory royalties to rightsholders. The NOIs were also transparent and factually accurate, telling rightsholders both when the NOI was issued and when Spotify

intended to or had already streamed a work. Smith Dep., RE.660-16, PageID#58914-15 (unredacted at RE.434-7). As the district court noted, while NOIs issued after a work was first streamed might be "legally ineffective" from a mechanical licensing perspective, such NOIs could not "deceive rights holders into believing that licenses had been obtained." Order, RE.704, PageID#64254-55.

It's unsurprising, then, that Eight Mile cannot point to any example in the record of anyone being misled by NOIs issued on Spotify's behalf. Indeed, Eight Mile admits that it *never bothered to review the NOIs* that either it or Kobalt received. Catlett Dep., RE.622-3, PageID#50069.

* * *

Because the district court faithfully applied the prevailing test for equitable estoppel to the undisputed facts, the court correctly concluded that Eight Mile's claims were barred by that doctrine.

## CROSS-APPEAL ARGUMENT

Because summary judgment on estoppel grounds was proper, the Court can affirm on that basis alone. But there are several independent grounds supporting judgment in Spotify's favor that the district court either rejected based on legal error or did not reach.

## I.    Spotify Had An Implied License To Use The EMS Compositions.

Eight Mile's claims are foreclosed because Spotify had an implied license to stream the EMS Compositions.

An implied license is an unwritten, non-exclusive license "to use the copyright for a particular purpose," and such a license "precludes a finding of infringement." *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). The district court concluded that an implied license did not exist, but its decision rests on a legal error: the court applied a subjective rather than objective test for determining when an implied license exists. Under the proper standard, the undisputed record justifies affirmance of summary judgment for Spotify.

### A.    Eight Mile's knowledge of and acquiescence in Spotify's use of the EMS Compositions created an implied license.

Many of the same undisputed facts that the district court concluded support equitable estoppel also constitute conduct that, viewed objectively, demonstrates the existence of an implied license. Eight Mile:

- knew *for years* that recordings embodying the Compositions were available on Spotify;

- knowingly accepted royalty and settlement payments from Spotify for those Compositions until shortly after the filing of this lawsuit; and

- did *absolutely nothing* prior to filing this lawsuit in 2019 to inform Spotify of its contention that Spotify could not stream the Compositions.

*See* Appeal Part I.B, *supra.*

Eight Mile's knowledge of Spotify's use of the EMS Compositions and its acceptance of royalty payments without objection created an implied license as a matter of federal law.

As the Supreme Court put it in the patent context, an implied license exists when the owner engages in conduct "from which [the] other may properly infer that the owner consents to [the] use." *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927). And this Court has explained that, in the copyright context, non-exclusive licenses "may be implied from conduct." *Johnson*, 149 F.3d at 500 (quoting 3 Nimmer on Copyright § 10.03[A] (1994)).

The Fifth and Ninth Circuits, along with numerous district courts, have held that an implied license exists when the totality of the circumstances shows that the copyright owner knew of use of the work and did not object—or, as also is true here, accepted benefits from that use. "Consent for an implied license may take the form of permission *or lack of objection*." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 500

(5th Cir. 2012) (emphasis added); *accord Evox Prods., LLC v. Chrome Data Sols., LP*, 2023 WL 1879479, at *3 (9th Cir. Feb. 10, 2023) (acceptance without objection of royalty payments to use online images created an implied license).[12]

Applying these principles, one district court held that Sony had an implied license to use songs in part because the copyright holders had "accepted [] royalty payments [for 12] years … and *prior to this action* [had] not objected to either these royalties or Sony's exploitation of the Songs." *Roger Miller Music, Inc. v. Sony/ATV Publishing Inc.*, 2005 WL 5351103, at *17-19 (M.D. Tenn. July 11, 2005) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 477 F.3d 383 (6th Cir. 2007).

Similarly, another court granted summary judgment on implied license grounds because the plaintiff "continued to accept … royalty payments for [the allegedly infringing] products" for years before bringing suit. *ExperExchange, Inc. v. Doculex, Inc.*, 2009 WL 3837275, at *23-24 (N.D. Cal. Nov. 16, 2009). And yet another court has held that "[a]cceptance of … [royalty] payments gives rise to an implied license as

---

[12]    *See also*, *e.g.*, *Parker v. Yahoo!, Inc.*, 2008 WL 4410095, at *3 (E.D. Pa. Sept. 25, 2008); *Field*, 412 F. Supp. 2d at 1116; *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997).

a matter of law." *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*, 446 F. Supp. 2d 1164, 1177-78 (E.D. Cal. 2006).

The reasoning of these cases—including music copyright cases like *Roger Miller* and *UMG*—applies here: Eight Mile knew that Spotify streamed the EMS Compositions and banked Spotify's royalty payments for nearly a decade without protest. That undisputed conduct created an implied license.

In its opening brief, Eight Mile barely engages with Spotify's implied-license argument, though it was a central feature of the proceedings below. And what little Eight Mile says is unconvincing. Relying on the Second Circuit's decision in *ABKCO*, Eight Mile asserts that its "acceptance of royalties is not sufficient to create an implied license as a matter of law." EMS Br. 25. But Eight Mile gets *ABKCO* wrong: there, the Second Circuit affirmed the district court's rejection of an implied license only because the rights owner was receiving royalties for *audio* works under a statutory license that expressly *excluded audiovisual* works (such as concert videos), yet the copyright infringement claim was for unauthorized use of musical works in videos. 50 F.4th at 315, 321. The record further showed that when plaintiffs

65

learned of the audiovisual use, they promptly sent a cease-and-desist letter. *Id.* Here, by contrast, Eight Mile accepted royalty payments for the streaming of the EMS Compositions on Spotify—the precise use that is the subject of Eight Mile's complaint—and never complained to Spotify prior to filing this lawsuit.

### B.    The district court erred as a matter of law in requiring Eight Mile to have subjective intent to license the works.

The district court acknowledged both that an implied license can be inferred from the "totality of the circumstances" and that it could "reasonably be viewed as unfair or misleading" for Eight Mile to accept royalty payments for Spotify's use of the EMS Compositions for years without informing Spotify that it was not consenting to Spotify's use of the works. Order, RE.704, PageID#64265-68. The court nonetheless concluded that there was no implied license *solely* because it held that the governing legal standard required Eight Mile to have "actually meant" (that is, had the *subjective intent*) to license the works and waive its right to sue for infringement. *Id.* at PageID#64267.

That conclusion was legal error. This Court recognized in *Johnson* that determining "intent" for purposes of an implied license turns on

"*objective* fact[s]" about a party's conduct (including omissions). 149 F.3d at 500, 502 (emphasis added). District courts in this Circuit have likewise recognized that the "test for an implied license is objective." *L.F.P.IP., Inc. v. Hustler Cincinnati, Inc.*, 2011 WL 5024356, at *6 (S.D. Ohio Oct. 20, 2011), *aff'd*, 533 F. App'x 615 (6th Cir. 2013); *accord, e.g.*, *Global Force Entm't, Inc. v. Anthem Wrestling Exhibitions, LLC*, 2020 WL 6440503, at *3 (M.D. Tenn. May 27, 2020); *Deere & Co. v. FIMCO Inc.*, 239 F. Supp. 3d 964, 1006 (W.D. Ky. 2017).[13]

Here, Eight Mile's conduct created the objective appearance that Eight Mile authorized Spotify's use of the EMS Compositions: Eight Mile knew for years that Spotify was using the Compositions and Eight Mile received and banked the royalty payments for that use. *Evox*, *Roger Miller*, *ExperExchange*, and *UMG* each have held that an implied license exists where a copyright holder has accepted royalty payments.

The district court acknowledged this line of cases (Order, RE.704, PageID#64267-68), but decided to chart a different course based solely on

---

[13]    This Court and others have relied on federal precedents in determining whether there is an implied license in the copyright context. *See, e.g.*, *Johnson*, 149 F.3d at 500; *Baisden*, 693 F.3d at 500-01; *I.A.E., Inc. v. Shaver*, 674 F.3d 768, 775-76 (7th Cir. 1996); *see also* 1 Raymond T. Nimmer & Jeff C. Dodd, Modern Licensing Law § 10:4 (2010-2011 ed.).

its erroneous legal view that Spotify had to prove Eight Mile had *subjective* intent to license the Compositions. *Id*. at PageID#64268.

That cannot be right. Every time a court determines that an implied license exists in the copyright context, the plaintiff has professed a lack of intent to license and sued under the Copyright Act. The district court's reasoning would thus bar an implied license defense in virtually every case. Because that reasoning is legally untenable, the district court erred as a matter of law by failing to hold that an implied license exists here. This Court should therefore uphold judgment in Spotify's favor because an implied license existed between Eight Mile and Spotify.

## II.   Because Kobalt Acted With Apparent Authority From Eight Mile, The 2016 BMLA And The Release In The NMPA Settlement Authorized Spotify's Use Of The EMS Compositions.

Eight Mile's holding out of Kobalt as its representative for purposes of licensing and settlement imbued Kobalt with apparent authority to act for Eight Mile when it entered into the 2016 BMLA and the NMPA settlements with Spotify. Those agreements therefore bind Eight Mile and independently foreclose its claims.

To begin with, the 2016 BMLA stated that it was granting Spotify a mechanical license to *all* "Publisher Compositions," defined as works

68

that Kobalt "owns, controls, or *administers*." Order, RE.704, PageID#64256 (emphasis added). As the district court recognized in holding that Kobalt was required to indemnify Spotify, the EMS Compositions are "Publisher Compositions," because "Kobalt administered the compositions *in some sense*." *Id.* at PageID#64287.

Kobalt also agreed to release claims involving Spotify's prior use of most of the EMS Compositions when it participated in the NMPA settlement. Significantly, Kobalt provided a list that included most of the EMS Compositions, including "Lose Yourself," when it made claims under the settlement in both 2016 and 2017. SUMF ¶¶ 322-23, 330-33, RE.590-5, PageID#45235, 45237-38. The releases covered prior use of the EMS Compositions through June 30, 2017, by which point the 2016 BMLA was already in effect. Order, RE.704, PageID#64256.

The district court should have concluded that Eight Mile was bound by these agreements, because, as explained below, Kobalt acted with apparent authority from Eight Mile.

Under New York law, apparent authority "arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents

to have [an] act done on his behalf by the person purporting to act for him.'" *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir. 2003). "Where reliance on apparent authority is reasonable in light of the circumstances surrounding the transaction, a principal is barred from disavowing obligations assumed by its agent." *Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entm't Servs.*, 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996).[14]

Eight Mile's conduct cloaked Kobalt with apparent authority. As previously discussed, Eight Mile intentionally authorized and maintained Kobalt as its publisher of record in HFA's and similar databases, knowing that industry participants would rely on that designation for licensing. *See* pages 13-18, *supra*.

In addition, Eight Mile directed Kobalt to participate in industry settlements with the NMPA "to be eligible for settlement monies." 2014 Settlement Direction, RE.625-4, PageID#50962. And Kobalt followed that direction by claiming most of the EMS Compositions in the NMPA settlement with Spotify.

---

[14]    All agree that New York law governs the apparent-authority issue. Order, RE.704, PageID#64262.

70

The district court acknowledged that these undisputed facts about Eight Mile's conduct "*could have* given rise to apparent authority." Order, RE.704, PageID#64263. But the court concluded that the reliance element wasn't satisfied because, under its view of the law, Spotify needed "to identify a single employee or ex-employee who would testify that he or she understood the 2016 BMLA to include the EMS Compositions when the agreement was signed." *Id.* That was legal error. Spotify was entitled to prevail because it demonstrated that, as a company, it relied on Kobalt's authority.

*First*, courts must consider industry custom in evaluating apparent authority. *See, e.g., Towers World Airways Inc. v. PHH Aviation Sys. Inc.*, 933 F.2d 174, 178 (2d Cir. 1991); *CBS, Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 375-76 (2d Cir. 1975). The district court recognized that it was industry custom for streaming services like Spotify to rely upon information in databases like HFA's for licensing purposes (Order, RE.704, PageID#64250)—the very information that Eight Mile deliberately chose not to update. Moreover, Spotify *did* rely on that information; for many compositions, the registrations are what dictated the largely-automated licensing and payment process. For example, after

71

the 2016 BMLA, when HFA matched a sound recording to an EMS Composition registered to Kobalt in HFA's database, HFA reported to Spotify that the composition was covered by the 2016 BMLA. SUMF ¶¶ 375-77, RE.590-5, PageID#45250-51.

More generally, courts have held that apparent authority can be satisfied at the entity level by documents in the company's files, without requiring an employee-specific showing. *See*, *e.g.*, *Yellow Book USA, LP v. Dearworth*, 2002 WL 31999361, at *1-2 (Del. Com. Pl. Oct. 1, 2002) (company files authenticated by custodian of records demonstrated apparent authority, without any additional employee testimony).

*Second*, Spotify could rely on Kobalt's pre-existing *actual* authority in light of Eight Mile's and Kobalt's failure to notify Spotify of the reallocation of licensing responsibilities. It's undisputed that Kobalt had actual authority to issue mechanical licenses to the EMS Compositions prior to the undisclosed arrangement with Bridgeport in 2011. SUMF ¶¶ 90-92, RE.590-5, PageID#45164-65; *see* EMS Br. 8 n.2. Spotify was entitled to rely on that pre-existing actual authority—meaning that Kobalt had apparent authority—until it was provided notice that Kobalt's authority was terminated; a third party like Spotify isn't

72

required to seek updates from the principal on the status of the agency relationship. *See*, *e.g.*, *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 995-96 (2d Cir. 1991); *Parlato v. Equitable Life Assur. Soc.*, 299 A.D.2d 108, 114-15 (N.Y. App. Div. 2002); Restatement (Second) of Agency § 125 (1958).

In other words, it is the "duty of a principal to give notice of the revocation of an agent's authority." *Parlato*, 299 A.D.2d at 115. Yet Spotify never was provided with that notice (until this lawsuit). Order, RE.704, PageID#64238-58. For that reason alone, it was reasonable for Spotify to assume that Kobalt continued to have the authority to license the EMS Compositions.

Because Spotify reasonably relied on Kobalt's apparent authority, Eight Mile was bound by the 2016 BMLA and NMPA settlements, and therefore Spotify was entitled to judgment as to all works covered by those agreements.

### III. The Music Modernization Act's Blanket License Independently Authorized Use Of The EMS Compositions Since January 1, 2021.

The MMA's blanket license authorized Spotify's use of the EMS Compositions since the blanket license became available on January 1, 2021.

It is undisputed that Spotify has taken all of the steps necessary to obtain the blanket license from the MLC and has been operating under the blanket license since January 1, 2021. Cohn Decl. ¶¶ 3-6, RE.590-7, PageID#45297; *see* 17 U.S.C. § 115(d)(2)(A).

Eight Mile argued below that it nonetheless may assert infringement claims for the period covered by the blanket license. In Eight Mile's view, if a service streamed a work before January 1, 2021, then the blanket license applies *only* if the service already had a valid license to stream the work under the old, *pre-MMA* system.

The district court found it unnecessary to reach that issue, but it presents a pure question of statutory interpretation that this Court may resolve. Eight Mile's outlier position—which, tellingly, no other litigant has raised—flies in the face of the statute and would yield absurd consequences.

74

## A. The statutory text and structure accomplish Congress's goal of providing comprehensive coverage not tied to the pre-MMA system.

Congress's goal in enacting the MMA's blanket license was to provide broad coverage not tied to the old compulsory licensing system. *See* page 9, *supra*. The statutory text accomplishes that goal.

Section 115(d)(1)(A) provides that a streaming service may "obtain a *blanket license* from copyright owners through the mechanical licensing collective *to make and distribute digital phonorecord deliveries of musical works*." 17 U.S.C. § 115(d)(1)(A) (emphasis added). Congress's use of the extremely broad term "blanket license" demonstrates that the license covers all works. As one dictionary puts it, when "blanket" is used as an adjective, it means "effective or applicable in *all* instances or contingencies." Merriam-Webster, "Blanket," https://www.merriam-webster.com/dictionary/blanket (emphasis added).

The statute describes the protection from infringement in equally expansive terms, stating that "[a] digital music provider that obtains and complies with the terms of a valid blanket license under this subsection shall not be subject to an action for infringement." 17 U.S.C.

§ 115(d)(1)(D). There are no exceptions in either provision for alleged failures to comply with pre-MMA licensing requirements.

Next, the blanket license covers "*all* musical works [] *available for compulsory licensing* under this section." 17 U.S.C. § 115(d)(1)(B)(i) (emphasis added). The phrase "available for compulsory licensing" refers back to subsection 115(a), titled "*Availability* and scope of compulsory license in general," which says that *all works* published in the United States are eligible for compulsory licensing. *Id.* § 115(a)(1)(A)(i)-(ii) (emphasis added). The EMS Compositions fall into this broad category. Because the EMS Compositions are therefore "available for compulsory licensing" within the meaning of the blanket license provision, they are covered by the blanket license.

## B.    Eight Mile's reading of the MMA is wrong.

Eight Mile reads the phrase "available for compulsory licensing" differently—and incorrectly. *See* EMS SJ Reply, RE.568, PageID#42880-92. In its view, if a digital music provider did not obtain a valid compulsory license of a particular work under the old, pre-MMA procedures in Section 115(b) but streamed that work before the blanket license became effective, then the blanket license doesn't cover that work.

According to Eight Mile, the work had—before the MMA's adoption—stopped being "available for compulsory licensing" under the blanket license.

But the statutory provisions Eight Mile has pointed to do not support that idiosyncratic interpretation. Eight Mile ignored that the MMA draws a clear distinction between (a) the old compulsory licenses that existed before the blanket license, and (b) the new blanket license.

The provisions that Eight Mile cited address only the old compulsory licenses and therefore have nothing to do with the blanket license. For example, Eight Mile has pointed to paragraph (b)(2)(A), which required sending an NOI to obtain a compulsory license "*prior to the [blanket] license availability date*." 17 U.S.C. § 115(b)(2)(A) (emphasis added).

Eight Mile also cited paragraph (b)(4)(B), but that paragraph provides that failure to serve the NOI required by (b)(2)(A) forecloses only "the possibility of a compulsory license *under such paragraph*"—meaning the old compulsory license available under (b)(2)(A). *Id.* § 115(b)(4)(B)(i)(I) (emphasis added). "Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down

the line." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017) ("When Congress wanted to refer only to a particular subsection or paragraph, it said so."). Here, Congress's reference to "under such paragraph" has a precise meaning: failing to properly issue an individual NOI under the pre-MMA regime bars only a compulsory license under that earlier regime.

By contrast, for uses of works "on or after the license availability date," the statute requires only that providers like Spotify comply with the procedure for obtaining the blanket license from the MLC under *(d)(2)*, which Spotify undisputedly did. *See* 17 U.S.C. §§ 115(b)(2)(B), (d)(2). And the statute in turn says that the MMA's blanket license is foreclosed for a period of three years *only if* those procedures to obtain a blanket license under subsection (d)(2) were not followed—it does not tie the availability or coverage of the blanket license to the old compulsory licensing system.

Thus, Eight Mile's interpretation isn't only inconsistent with the statute's plain text, but also violates the principle that "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress

78

acts intentionally and purposely in the disparate inclusion or exclusion.'"

*Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). If Congress had wanted to foreclose blanket license coverage based on prior unlicensed uses of a work, it would have said so explicitly.

Eight Mile also has pointed to paragraph (d)(9)(A), but that paragraph just says that the MMA's blanket license will "be automatically substituted for and supersede any existing compulsory license previously obtained under this section." 17 U.S.C. § 115(d)(9)(A). It does *not* say that the blanket license covers a work *only* if there is an existing compulsory license.

## C.    Eight Mile's reading yields absurd results.

The MMA's text and structure alone are dispositive. But Eight Mile also has no answer to the many absurd consequences that would follow from its interpretation.

*First*, it would be incongruous for Congress to have made the scope of the new blanket license dependent on compliance with an old system that Congress recognized was broken. *See* U.S. Br., RE.550, PageID#42101-02. That is especially so when the result would be to create a blanket license full of holes.

*Second*, Eight Mile's reading means that there would be no way for a service to obtain a compulsory license for works embodied in unmatched songs that were made available in 2019 and 2020 (after the MMA was enacted but before the blanket license went into effect). The MMA immediately eliminated the option of filing an NOI with the Copyright Office when "the public records of the Office do not identify the owner or the owner's address." 17 U.S.C. § 115(b)(2)(A). Accordingly, Eight Mile's interpretation yields the anomalous result that, if a streaming service could not match a work newly added to its service in 2019 or 2020, the blanket license wouldn't apply *and* there would be no other way to obtain a compulsory license—even though the statute makes clear that Congress was trying to expand the availability of compulsory licenses.

*Third*, it also would be absurd for Congress to make the MMA's limitation on liability broader than the blanket license itself. The limitation on liability protects digital music providers against statutory damages and attorneys' fees for all works, regardless of whether the provider complied with the pre-MMA NOI regime. 17 U.S.C. § 115(d)(10)(A). But it does so only for uses "prior to the license availability date" of January 1, 2021. *Id.* There's a simple reason why the

limitation on liability has an expiration date: the blanket license covers all post-2021 uses. Under Eight Mile's reading, once the blanket license regime went into effect, Congress's protection would drop away for all post-2021 uses of works that were used, but not licensed, pre-MMA, with streaming services again facing infringement litigation. Nothing in the statute supports that bizarre construction.

*Finally*, Eight Mile's argument isn't limited to Spotify. *Every* streaming service had significant numbers of unmatched songs under the pre-MMA regime. Twenty services paid $424 million in unmatched royalties to the MLC to secure the protection of the MMA's limitation on liability. MLC Blog, RE.646-3, PageID#53922-23. Those payments would make little sense if services again would face litigation for statutory damages and attorneys' fees once the blanket-license regime went into effect. And if Eight Mile's reading of the MMA were correct, every service—including Google, Apple, and Amazon—would face the very sort of claims asserted here.

## CONCLUSION

The judgment in Spotify's favor should be affirmed.

Dated: May 29, 2025                    Respectfully submitted,

*/s/ Andrew J. Pincus*
Andrew J. Pincus
*apincus@mayerbrown.com*
Archis A. Parasharami
*aparasharami@mayerbrown.com*
Daniel E. Jones
*djones@mayerbrown.com*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
Telephone: (202) 263-3000

Matthew Ingber
*mingber@mayerbrown.com*
Allison Aviki
*aaviki@mayerbrown.com*
Rory Schneider
*rschneider@mayerbrown.com*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2500

*Attorneys for Defendant-Appellee/
Cross-Appellant Spotify USA Inc.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7)(B) and Rule 28.1(e)(2)(B) because it contains 15,294 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 365 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: May 29, 2025                     */s/ Andrew J. Pincus*
                                        Andrew J. Pincus

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on May 29, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Andrew J. Pincus*
Andrew J. Pincus

# ADDENDUM

## DESIGNATION OF RELEVANT ORIGINATING COURT DOCUMENTS

Pursuant to 6 Cir. R. 28(b)(1)(A)(i), Spotify respectfully designates the following relevant originating court documents:

- Complaint, RE.1, PageID#1, 5-6, 30-31

- Proposed Case Management Order, RE.88, PageID#673

- Bifurcation Order, RE.89, PageID#686-87

- Third-Party Complaint, RE.91, PageID#712-34

- Amended Complaint, RE.97, PageID#783

- HFA SUMF, Under Seal at RE.322, pp.8-10

- Bridgeport-Martin Affiliated Agreement, Under Seal at RE.332-20, pp.18, 27-28

- NMPA-Spotify Agreement, Under Seal at RE.338-18, pp.17-18

- 2007 Eight Mile-Kobalt Agreement, Under Seal at RE.356-16, pp.2-27

- UMG Settlement, Under Seal at RE.428-9, pp.A-2, A-3

- Standstill Agreement, Under Seal at RE.439-14, pp.2-3

- Termination Email, Under Seal at RE.439-16, p.2

- U.S. Br., RE.550, PageID#42091-120

- Spotify MSJ, RE.553, PageID#42218

- Spotify Opp., RE.556, PageID#42292, 42299-300

- EMS MSJ, RE.566, PageID#42753-69

- EMS Opp., RE.567, PageID#42815-16

- EMS SJ Reply, RE.568, PageID#42880-92

- SUMF, RE.590-5, PageID#45143-47, 45149-52, 45154, 45157, 45160-62, 45164-65, 45167, 45169-76, 45193-201, 45221-22, 45225-26, 45228-31, 45234-39, 45242, 45249-53, 45258-75, 45277-79

  - Unredacted at Sealed RE.325, pp.6, 81-82, 85, 94-99, 109, 118-127, 132-133, 135, 137-139

- Cohn Decl., RE.590-7, PageID#45297

- Levine Report, RE.590-10, PageID#45332, 45335-36

- Ahdritz Interview, RE.612-9, PageID#49013

- Martin Dep., RE.619-8, PageID#49703, 49728-29, 49703

- Prospectus, RE.619-10, PageID#49771, 49773-74

- Bradley Dep., RE.619-12, PageID#49787-88

- Catlett Dep., RE.622-3, PageID#50062, 50069, 50095

- Arnay Dep., RE.622-8, PageID#50342

- Corton Dep., RE.623-7, PageID#50691-93

- Kobalt 2011 Internal Email, RE.624-4, PageID#50812

- Kobalt LOD, RE.624-5, PageID#50815

  - Unredacted at Sealed RE.335-19, p.2

- 2014 Settlement Direction, RE.625-4, PageID#50962

- 2016 BMLA, RE.625-14, PageID#51020, 51025-26

- Indemnification Notice, RE.625-16, PageID#51036

- HFA Resp. to EMS SUMF, RE.626, PageID#51075-76

- 2009 Eight Mile-Kobalt Agreement, RE.627-6, PageID#51213-14

- Boladian Decl., RE.627-8, PageID#51224-25

- Copyright and the Music Marketplace, RE.627-16, PageID#51252

- Plan of Attack Email, RE.627-21, PageID#51277-78

- NYTimes Article, RE.633-12, PageID#52666

- MLC Blog, RE.646-3, PageID#53922-23

- Harrison Hearing Testimony, RE.647-2, PageID#54767-69

- Spotify Resp. to EMS SUMF, RE.651-2, PageID#55947

- Martin Dep., RE.653-3, PageID#56297, 56308, 56313

  - Unredacted at Sealed RE.420-3, pp.445, 513

- Copyright and the Music Marketplace, RE.657-14, PageID#58075

- Martin Decl., RE.659-2, PageID#58371

- Kanner Dep., RE.660-6, PageID#58698

- Smith Dep., RE.660-16, PageID#58914-15, 58960-61

  - Unredacted at Sealed RE.434-7, pp.83-84, 500-01

- Video Interview, RE.665-16, PageID#60180 (manually lodged)

- Summary Judgement Order ("Order"), RE.704, PageID#64237-58, 64262-70, 64272-92, 64294-95

- Entry of Judgment, RE.722, PageID#65054

- EMS Notice of Appeal, RE.732, PageID#65839-43

- Hearing Tr., RE.735, PageID#65848-66015

- Spotify Notice of Conditional Cross-Appeal, RE.736, PageID#66016

- Order Denying Kobalt Motion for Entry of Final Judgment, RE.754, PageID#66144